IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

LORA FREIER-HECKLER,

      Plaintiff,                                Case No.

    vs.                                             1:20CV367

ROBERT WILKIE, SECRETARY

OF THE DEPARTMENT OF

VETERAN AFFAIRS,

      Defendant.

- - - - -

DEPOSITION OF LORA FREIER-HECKLER

Taken on Tuesday, October 19, 2021, at 10:00 o'clock a.m.

At The Offices Of:

U.S. Attorney's Office

801 West Superior Avenue

Suite 400

Cleveland, Ohio  44113

Before Margaret Elmo, Court Reporter and

Notary Public in and for the State of Ohio

**GOVERNMENT EXHIBIT 1**



Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

2

1    APPEARANCES:

2    .

3         On behalf of the Plaintiff:

4              Avery Friedman & Associates, by

5              Avery Friedman, Esq.

6              701 The City Club Building

7              Cleveland, OH 44114

8              (216) 621-9282

9              avery@lawfriedman.com

10   .

11        On behalf of the Defendant:

12             U.S. Attorney's Office, by

13             Rema Ina, Esq.

14             Sara E. DeCaro, Esq.

15             801 West Superior Avenue, Suite 400

16             Cleveland, Ohio  44113

17             (216) 622-3684

18             rema.ina@usdoj.gov

19             sara.decaro.usdoj.gov

20                       - - - - -

21        ALSO PRESENT:

22             Mr. Nick Pasquarela

23             Ms. Erica Skelly

24                       - - - - -

25   .


Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com      fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445,  Akron, OH  44308  -  330.253.8119

11

1             Q.   Thank you for your service.

2             You were a reservist from 1990 to

3      1997?

4             A.   Correct.

5             Q.   From what I understand, you

6      started working at the VA Medical Center

7      in 1990; is that right?

8             A.   Correct.

9             Q.   And you started as a clerk

10     or secretary?

11            A.   Correct.

12            Q.   How long did you hold that

13     position?

14            A.   It was 32 years ago.  I'd

15     have to look at my personnel file.

16            Q.   Okay.  Where exactly were

17     you a secretary?  Do you remember what

18     section?

19            A.   I don't believe it was a

20     secretary. I believe it was like an

21     admin position for the chief of

22     medicine's office was my first position

23     at the VA.

24            Q.   Okay.  I have that in 2000

25     you were reassigned from EMS to


Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

19

```
 1                Q.   Okay.  Tell me then.
 2                A.   Could you repeat the date,
 3    please?
 4                Q.   Sure.  October 2014.
 5                A.   So I accepted the position
 6    for the assistant chief of logistics,
 7    but the director at the time, Susan
 8    Fuehrer, wouldn't let me go to  that
 9    position.  She said that I needed to do
10    a detail in EMS because the chief was
11    retiring.
12                Q.   So EMS is environmental
13    management service, right?
14                A.   Correct.
15                Q.   So the chief of EMS was
16    retiring?
17                A.   Correct.
18                Q.   So before you could fill the
19    role of assistant chief of logistics,
20    the director asked you to fill a detail
21    in EMS?
22                A.   Yes, but she gave me the GS
23    level of the chief -- assistant chief of
24    logistics, which was equal to the EMS
25    position.
```



**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

                                                          **20**

1              Q.  And what's that GS level?

2              A.  Thirteen.

3              Q.  Do you know how long you

4    were the acting assistant chief of EMS?

5              A.  Could you repeat that date

6    again?

7              Q.  Sure.  2014.

8              A.  The month?

9              Q.  October.

10             A.  Approximately five months.

11   Four to five months.

12             Q.  And what happened after that?

13             A.  I took leave and then I went

14   to logistics service in April of '15.

15             Q.  Why did you take leave?

16             A.  Because I had it -- my son

17   was on active duty and stationed in

18   Alaska and I wanted to see him.

19             Q.  Okay.  So then in April 2015

20   you began your role as the assistant

21   chief of the logistics service?

22             A.  Yes.

23             Q.  And that was a GS-13, right?

24             A.  Yes.

25             Q.  It was during this time that


Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

36

1    to you professionally?

2              A.   Just an audit.

3              Q.   Okay.  It wasn't something

4    that you protested this assignment?

5              A.   No.

6              Q.   At some point in 2017 you

7    completed your Ph.D., you earned your

8    doctorate?

9              A.   October of 2017.

10             Q.   Why did you decide to pursue

11   a Ph.D.?

12             A.   Because I wanted it.

13             Q.   Okay.

14             A.   It was personal.

15             Q.   Okay.  Did your job require

16   it?

17             A.   No.

18             Q.   I have that in January 2018

19   you were detailed to Parma community

20   based outpatient clinic pharmacy

21   service.

22             A.   Detailed I don't think is

23   the correct word.

24             Q.   Okay.  What word would you

25   use?



1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

**Lora Freier-Heckler**                    10/19/2021

                                                                40

1    GS-12 position.  I have in that position

2    you made, in the beginning,

3    approximately $100,000 a year.  Does

4    that sound right?

5              A.  Approximately.

6              Q.  And then I have in 2019,

7    later that year, it went up to $101,000.

8    And then in 2020 it went up to

9    $107,000.  So were there incremental

10   steps in your salary?

11             A.  I wasn't there long enough

12   for it to be steps, no.

13             Q.  Okay.

14             A.  I think maybe -- a fiscal

15   year cost of living maybe.

16             Q.  Okay.  So then in February

17   2020, you got the position systems

18   design manager?

19             A.  Systems redesign manager?

20             Q.  Is that correct?

21             A.  Yes.

22             Q.  February 2020?

23             A.  Yes.

24             Q.  So you were a budget

25   analyst, then, for five months,



**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

43

1    differently?

2              MR. FRIEDMAN:  Object.

3              Go ahead.

4              A.   I don't know.  I would hear

5    stuff, but I don't know if they followed

6    through with anything or anything.

7              Q.   Nothing that you witnessed or

8    had firsthand knowledge of?

9              A.   I would not like the way he

10   talked to some female subordinates.

11             Q.   How so?

12             A.   It was in a negative,

13   demeaning derogatory, harassing manner.

14             Q.   Okay.  Can you give me

15   examples?

16             A.   He told a female that she

17   couldn't wear high heels during an

18   inspection.

19             Q.   Do you know why he said

20   that?

21             A.   I don't.

22             Q.   Do you know who the female

23   was that he said that to?

24             A.   I believe it was Melissa

25   Kasper.



**Lora Freier-Heckler**                                    10/19/2021

44

1          Q.  Do you have other examples

2     of him talking to women in a derogatory

3     or harassing manner?

4                A.  So Phil Rutledge would ask

5     people after and during, when I -- I

6     just feel like I was retaliated by Phil

7     Rutledge the minute I filed my EEO

8     complaint.  From the minute I walked

9     into the door, not giving me access, and

10    I couldn't take it after two years to

11    when I filed, I've had nothing but

12    retaliation since.

13                Q.  Okay.  And we are going to

14    talk about that as well.

15                Before you filed the EEO, did you

16    feel that Phil Rutledge mistreated you?

17                A.  Yes.

18                Q.  So let's focus on that

19    period first and then we'll talk about

20    after the EEO.

21                A.  Okay.

22                Q.  What were some of the things

23    he did to you that created the hostile

24    work environment?

25                A.  He wouldn't give me access



**Lora Freier-Heckler**                      10/19/2021

45

1    to the computer, access that I needed to

2    do my job.

3              Q.  Okay.  How so?

4              A.  I should have approved

5    people's leave.  He wouldn't give me

6    access to do that. He --

7              Q.  Sorry.  What do you mean by

8    he wouldn't give you access?

9              A.  So there's panels of access

10   that maybe a clerk wouldn't have, but an

11   assistant chief or chief would have.

12   About a month after being there, I was

13   realizing that the accesses weren't

14   coming.

15             Q.  Okay.

16             A.  And it was confirmed when

17   the employees told me that I should have

18   accesses and he was denying them.

19             Q.  Okay.  So you're telling me

20   that employees would, what, request

21   leave?

22             A.  That's one example.

23             Q.  And he would deny their

24   leave, for example?

25             A.  That's not what I said.


**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

**Lora Freier-Heckler**                          10/19/2021

46

1           Q.   Okay.   Then --

2           A.   Like maybe a purchaser was

3    doing a purchase and they needed it

4    signed off by a supervisor or an

5    assistant chief, I didn't have that

6    access.

7           Q.   To sign off on it?

8           A.   And then it would have been

9    complete.

10          Q.   Okay.   Do you know if Phil

11   signed off on it?

12          A.   He did because he wanted to.

13          Q.   Okay.   So he would do -- he

14   did not give you access because he did

15   it?

16          A.   I don't know if he did it or

17   not, but he didn't want me to have it.

18          Q.   Okay.   Did he ever tell you

19   that he didn't want you to have access

20   to it?

21          A.   Yes.

22          Q.   Okay.   What did he say?

23          A.   He didn't trust me.

24          Q.   Did he tell you why?

25          A.   I asked.   He didn't.   But he


**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

47

1   was on the interview board, he picked
2   me.
3           Q.  So he was part of the group
4   that hired you in that position?
5           A.  He was the final decision
6   who picked me.
7           Q.  Okay.  And he didn't tell
8   you why he didn't trust you?
9           A.  He did not.
10          Q.  How does this negatively
11  interfere with your work performance?
12          A.  Because I feel like Mr.
13  Rutledge hung over my head.  If I
14  didn't do what he asked me to do, then
15  my rating wouldn't be what it should
16  have been.
17          Q.  What do you mean by, your
18  rating?
19          A.  So different parts of the
20  year there's incentive awards that are
21  given out, approximately March through
22  maybe June, and then an end-of-year
23  rating.
24          Q.  So were you afraid you
25  wouldn't get an incentive reward; was


Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

48

1    that one concern?

2                   A.   I knew I wouldn't.

3                   Q.   And were you worried about

4    your end-of-year rating?

5                   A.   I was afraid.

6                   Q.   How were your ratings when

7    you worked under Phil Rutledge, your

8    end-of-year reviews?

9                   A.   The same as they had been

10   for decades, outstanding.

11                  Q.   Did you get any incentive

12   rewards while you worked under Phil

13   Rutledge?

14                  A.   I believe so.

15                  Q.   Okay.  How else did he --

16   did Phil Rutledge create a hostile work

17   environment for you?

18                  A.   He moved my office away from

19   the employees I was supposed to

20   supervise.

21                  Q.   Okay.  Correct me if I'm

22   wrong, I read that you were moved from

23   a cubicle to an office; is that correct?

24                  A.   That is not correct.

25                  Q.   You were always in an



**Lora Freier-Heckler**                    10/19/2021

49

1  office?

2            A.  I was in an office and I was

3  moved across the hall into a secured

4  room with him with separate offices.

5            Q.  Okay.  But you were in the

6  same area as Phil Rutledge, you were

7  moved to?

8            A.  Correct.  He moved me over

9  in his section.  So there's a suite, a

10 hall and into another suite.

11           Q.  Okay.

12           A.  With separate offices.

13           Q.  Did he tell you why?

14           A.  He said it was because we

15 were getting more staff, but that was

16 not true.

17           Q.  Okay.  And you didn't like

18 the move?

19           A.  I did not like the move.

20           Q.  Did you tell him that?

21           A.  I did tell him that.

22           Q.  What did he say?

23           A.  You're moving.

24           Q.  Okay.  How did moving your

25 office to the suite across the hall



**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

53

1   Rutledge denying you computer access.

2   We talked about him moving your office.

3   What are other ways he created a hostile

4   work environment?

5            A.   He asked me to watch his

6   10-year-old son and if I denied it, I

7   wouldn't have an outstanding rating.

8            Q.   Did he tell you that?

9            A.   He told me that.

10           Q.   Did it happen one time or

11  more than one time that he asked you to

12  watch his 10-year-old son?

13           A.   One time.

14           Q.   Did you have to watch him,

15  like, at Phil's house, or where did he

16  want you to watch him?

17           A.   Well, I didn't want to watch

18  him, but he made me feel like if I

19  didn't that it would affect my rating.

20           Q.   Okay.  So you did watch the

21  son?

22           A.   I did.

23           Q.   Again, was it at Phil's

24  house or at the office?

25           A.   It was at my house.


Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

**Lora Freier-Heckler**                    10/19/2021

54

1          Q.  Your house.  Okay.  Do you

2    remember how long it was for?

3          A.  Several hours.  I think he

4    had someone else to watch him, but they

5    canceled and he went on a date.

6          Q.  Any other ways that he

7    created a hostile work environment?

8          A.  After that, he asked me to

9    watch his house.

10          Q.  Was he out of town or

11    something like that?

12          A.  He was going out of town and

13    the person that was supposed to watch

14    his house canceled for whatever reason.

15          Q.  Okay.  Did you watch his

16    house?

17          A.  So there's a difference

18    between asking someone to do

19    something --

20          Q.  I'm sorry.  I can see you're

21    getting emotional.  Why does it make you

22    so emotional?

23          A.  You're not making me

24    emotional. What he did to me, every time

25    I have to talk about it and relive it


**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

57

1    bypass me if everyone in here was male.

2              Q.   So he wouldn't let you talk?

3              A.   There was one meeting where

4    he told me I couldn't talk.

5              Q.   Do you remember what meeting

6    that was that he told you not to talk?

7              A.   It was a weekly meeting.  It

8    was the supervisor's meeting.

9              Q.   Okay.  Did you attempt to

10   talk and he told you stop talking?

11   What exactly happened?

12             A.   That's exactly what happened.

13             Q.   Okay.  Did he give you a

14   reason why to stop talking?

15             A.   So this is approximately two

16   years into this behavior.  That was the

17   day I had enough.  And I had a white

18   female -- so this particular meeting

19   there were like junior supervisors --

20   one junior supervisor that was there,

21   she was in charge of purchasing.  Junior

22   meaning she was a lower grade than the

23   rest of the 12 supervisors.

24             There was a white female and a

25   black female, and they were


**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

58

1   approximately in their late 20s, leaned

2   over to me and said, is this how women

3   are treated in the federal government

4   and I said no.

5            Q.  Was that after he told you

6   to stop talking?

7            A.  I requested to talk to him

8   in his office.  It was towards the end

9   of the meeting. At which point people

10  would have left and he asked them to

11  stay and told me to leave in front of

12  my subordinates.

13           Q.  Okay.  So you said people

14  had started to leave.  So who was still

15  there?

16           A.  No, I said they should have

17  left.  At that point they should have

18  left, but they were all at the table

19  and he told them to stay.

20           Q.  Okay.

21           A.  We went in his office.  I

22  left the door open because I was

23  uncomfortable, and I asked him, why did

24  you tell me I couldn't talk in a

25  meeting?  And he turned around and he


Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

62

1          Q.   After this meeting did he

2     ever tell you to leave another meeting

3     again?

4          A.   No.

5          Q.   Okay.  Did he ever tell you

6     not to talk at another meeting?

7          A.   No.  He did tell me that I

8     couldn't talk to the director, Susan

9     Fuehrer, or the deputy director, Andy

10    Pasina, or the associate director, Beth

11    Lumia.  And that was my chain of

12    command.  He told me I could not talk

13    to them.

14         Q.   Did he say why?

15         A.   I said, they're my chain of

16    command. What he didn't realize is I

17    worked for Sue off and on in positions

18    for two decades.  And he said he didn't

19    want me to.  He wanted to control where

20    my office was, who I supervised, and he

21    wanted me to go to every meeting with

22    him.  There's no reason a chief and

23    assistant chief have to go to the same

24    meeting.

25         Q.   When he told you not to


Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

**Lora Freier-Heckler**          10/19/2021

64

1               A.   So I would talk to Andy

2   because he had logistics. And then when

3   Beth came, she got logistics, so then I

4   met with Beth. And then I met with the

5   chief of HR, Charles Franks, and then I

6   met with the director. A total of

7   about 187 times, to stop Phil Rutledge's

8   behavior.

9               Q.   So when he told you not to

10   speak to anyone in your chain of

11   command, you didn't listen to him?

12               A.   I didn't have to listen to

13   him. I'm a federal employee.

14               Q.   Right.

15               A.   I can speak to whoever I

16   want to speak to.

17               Q.   Okay. Right, he couldn't

18   stop you from talking --

19               A.   He shouldn't have said that

20   to me.

21               Q.   Fair enough. But the next

22   step is that it didn't stop you from

23   talking to the people in your chain of

24   command?

25               A.   It didn't stop his harassment


**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103 - 216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308 - 330.253.8119

75

1              A.   He controlled -- he attempted

2    to control the daily function when it

3    didn't need to be like that.  If I

4    wanted you at a meeting, I would invite

5    you to a meeting and send you a meeting

6    invite.

7              Q.   Right.  Okay.  So let's talk

8    about the access to his calendar.  Phil

9    Rutledge had previously said that he

10   removed access to  everyone including

11   male supervisors from his calendar.

12             A.   That's a false statement.

13             Q.   Who were the men that still

14   had access to his calendar?

15             A.   Bob Conkey.

16             Q.   Can you spell the last name?

17             A.   C-O-N-K-E-Y.  First name is

18   Robert.

19             Q.   What was his position?

20             A.   He was the approximate

21   management analyst.  Maybe it was

22   program management analyst.

23             Q.   How do you know he still had

24   access to Phil Rutledge's calendar?

25             A.   I asked him and he confirmed


**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH  44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH  44308  -  330.253.8119

76

1    he did.

2              Q.   He told you.  Okay.  What

3    other men --

4              A.   There was another one.

5              Q.   Go ahead.

6              A.   He had an administrative

7    clerk, maybe a GS-6.  I asked him if he

8    had the access and he confirmed that he

9    did.

10             Q.   Was that Mr. Suuru?

11             A.   S-U-U-R-U, yes.

12             Q.   Was he Philip Rutledge's,

13   like,  assistant or -- in his admin

14   position, what did he do?

15             A.   To me he was more -- he was

16   more like a GS-6 clerk.

17             Q.   Okay.  Did he organize

18   Philip Rutledge's calendar?  Did he put

19   items on there?

20             A.   I believe both of them did.

21             Q.   Okay.

22             A.   But Suuru was also an Air

23   Force vet. So Phil would have lunch with

24   him, lunch with certain men every day.

25             Q.   Okay.

 **Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

**1.800.694.4787    www.cefgroup.com    fax: 216.687.0973**
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

77

1            A.   And if you weren't part of

2    that group, you knew you weren't going

3    to get an incentive award.

4            Q.   Okay.  Who else?  What other

5    men had access to Phil Rutledge's

6    calendar?

7            A.   Those are the main two

8    administrative people that would have

9    had access. If others did, I'm unaware.

10   I stopped asking when I knew those two

11   were the main ones for me.

12           Q.   Okay.  Is it a requirement

13   that supervisors share their calendars

14   with their subordinates?

15           A.   It's not.  But as I stated

16   previously, in no other -- in the VA,

17   I've always had to move out to move up.

18           Q.   What does that mean?

19           A.   So there weren't positions

20   that went from three to 13 in one

21   office.  Everybody probably would have

22   liked that.  But if I wanted a

23   promotion or opportunity for promotion,

24   I had to move out of that service to

25   move up.



Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103 - 216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308 - 330.253.8119

86

```
 1              Q.  Okay.  Well, if you think of
 2      more throughout the deposition, let me
 3      know.  Feel free.  We can always go
 4      back to this.
 5              A.  Can we go back to my
 6      doctorate?  It  was Capella.
 7              Q.  Is that the school you went
 8      to?
 9              A.  Yes.
10              Q.  How do you spell it?
11              A.  C-A-P-E-L-L-A.
12              Q.  Where is Capella?
13              A.  It's online.  They gave me a
14      veteran discount and I could work
15      full-time and do that at night.  I know
16      people think it's not a doctorate
17      because it was online, but it is.
18              Q.  Let's talk about your EEO
19      filings. I have that you filed your
20      first EEO charge April of 2017.  Does
21      that sound right?
22              A.  Yes.
23              Q.  Okay.
24              A.  The director told me to do
25      it.
```


**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  - 216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308 - 330.253.8119

**Lora Freier-Heckler**                    10/19/2021

93

1    for, the 10-day suspension was on paper

2    and over the weekend.

3              Q.  He was suspended, though,

4    Phil Rutledge?

5              A.  No.  He was given a letter

6    -- he was given an opportunity that that

7    letter would stay in his file

8    permanently but he wouldn't have to

9    serve it.

10             Q.  Okay.  So that letter is in

11   his file permanently?

12             A.  It should be.

13             Q.  Okay.  Fair enough.

14             A.  But why wasn't I offered

15   that?

16             Q.  So you were also

17   investigated, correct?

18             A.  So after the Chavtz and Phil

19   audit that I was requested to do, after

20   those findings, Chavtz Seals was demoted

21   from a 12 to a GS-9; had nothing to do

22   with me, that was Phil and human

23   resources.  He filed an EEO case.  I

24   was asked to testify on the VA's behalf.

25   Amber Grohen --


**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

94

1          Q.   Can you spell the last name?

2          A.   G-R-O-H-E-N, but that may not

3     be right.  She was there.  Lauren

4     Chahita was there from human resources.

5     He was represented by the union.  There

6     was an administrative law judge. He made

7     false accusations.

8          Q.   Who's the he?

9          A.   Chavtz Seals made false

10    allegations that reason the volunteers

11    had a Super Max key that opens anything

12    in the medical center was because I gave

13    it to -- I said that it was okay. I

14    would never say that that's okay.  As

15    soon as I found out about it, I

16    confiscated the key, I contacted the

17    assistant chief of engineering and I

18    made him sign for the key to give it

19    back.

20          Can you repeat your question,

21    please?

22          Q.   You were investigated by

23    the --

24          A.   So, I was then asked to

25    testify for the VA.  And three days


**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

96

1    investigation against you and we're

2    going to use an exhibit.

3              MR. FRIEDMAN:  Let me object to

4    the inquiry about the AIB.

5              MS. INA:  Okay.

6                    - - - - -

7         (Thereupon, Government Exhibit-A

8         was marked for identification.)

9                    - - - - -

10              Q.  Doctor, you've been handed

11   Government Exhibit A.  Have you ever

12   seen this document before?

13              A.  Yes.

14              Q.  Okay.  What is it?

15              A.  It's the AIB's report.

16              Q.  Regarding your investigation,

17   correct?

18              A.  Yes.

19              Q.  It's dated March 21, 2018?

20              A.  Yes.

21              Q.  Then it says from.  It says

22   Jessica Minnich, HR Specialist.  Do you

23   know Jessica Minnich?

24              A.  No.  She works for VA

25   regional  office, but the director knew


Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103 - 216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308 - 330.253.8119

1    indicated that you looked at the

2    document and said what the hell is this

3    shit under your breath.  Did you make

4    this statement?

5              A.   That's not what this says.

6    This  says Dr. Heckler said, shit, what

7    the hell is this, there's nothing on

8    here, or words to that effect, per

9    Robert Conkey.

10             Q.   Per Robert Conkey.  The next

11   paragraph says, Dr. Freier-Heckler

12   indicated.  Do you see that?

13             A.   Yes.

14             Q.   It says, you looked at the

15   document and said, what the hell is this

16   shit under your breath.  Is that what

17   you said?

18             A.   I did say it under my breath

19   and I admitted to that when I was

20   questioned.  Because I had the VISN on

21   the phone, I had an end of fiscal year

22   meeting and a supervisor that's a GS-12

23   just handed me a blank piece of paper

24   and there's no end of year report.

25             But the only person that could



114

1              A.  I testified to that.  I told

2     them they could talk to my husband.

3     They chose not to.  I was at home.

4              Christie Hicken at the time --

5     and again, I do want it stated that I

6     do feel re-victimized again by having to

7     answer these questions that this board

8     has already said that Christie Hicken

9     was not credible.  And here I am

10    answering the same question.  Why is

11    that?

12             MR. FRIEDMAN:  We've interposed

13    the objection.

14             Go ahead.

15             Q.  So Darryl Johnson and

16    Christie Hicken described you yelling at

17    Mr. Seals. That's what this memorandum

18    says?

19             A.  And they're entitled to their

20    opinion, but they are not telling the

21    truth.

22             MS. INA:  I'm going to mark

23    another document as an exhibit.

24             A.  Chavtz Seals had no authority

25    to bring in Christie Hicken.  He wasn't


Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787      www.cefgroup.com      fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

132

1    office, Lora's fine.  But if I'm in a

2    formal meeting, if other pharmacists are

3    being called doctor or researchers are

4    being called doctor, then I would expect

5    it because it was earned.  He said he

6    would not call me doctor.

7            After I received it, I was in

8    meetings with service chiefs and he

9    would refer to Dr. Tim Heimann, the

10   chief of pharmacy and  assistant

11   director of community based clinics, as

12   doctor.

13            Q.  Okay.

14            A.  He would refer to Neil

15   Peachy, the chief of research, as

16   doctor.  But he refused at every point

17   to refer to me as doctor.

18            Q.  Okay.  Tim Heimann, does he

19   have a Ph.D.?

20            A.  He's a Pharm D.

21            Q.  And then Neil Peachy, does

22   he have a Ph.D.?

23            A.  Yes.

24            Q.  Did Phil Rutledge ever give

25   you a reason why he wouldn't call you


Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

**Lora Freier-Heckler**                          10/19/2021

133

1    doctor?

2              A.   No, he just said that he

3    would not. The only difference between

4    me, Tim and Neil is that I'm a female.

5              Q.   Okay.  How did this affect,

6    negatively interfere with your work

7    performance when he wouldn't call you

8    doctor?

9              A.   Well, it's disrespectful.

10   Right? It causes animosity in meetings

11   because he's being respectful to Tim

12   Heimann in meetings, he's being

13   respectful to Tim Peachy.  And when

14   they're not present, when supervisors

15   are present, he's  just blatantly not

16   respectful towards me and the only thing

17   that was different between me and any

18   other supervisors was that I was a

19   female.

20             Q.   Okay.  I'm glad that you

21   added that. Is there anything else that

22   you thought of?  We just took a lunch

23   break.  Anything else come up that you

24   remembered as far as things he did that

25   created a hostile work environment?


**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787     www.cefgroup.com     fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

138

1    had applied for years prior and was told

2    I wasn't qualified.  I thought it was

3    very interesting that HR then said I was

4    qualified.  I did not think I should

5    have been demoted.  So I applied for

6    the GS-13.  I interviewed and I was

7    selected.

8             Q.  Okay.  That's your current

9    position?

10            A.  Yes.

11            Q.  Okay.  We're going to talk

12   about damages in the lawsuit.  One thing

13   we're going to look at is the difference

14   in pay.  It's called lost wages.

15            When you were demoted to the

16   budget analyst, what was the reduction

17   in your pay?

18            A.  They took me from a -- I

19   don't remember exactly what I was then,

20   maybe a 13-4 or five to 12-10.  The

21   reduction in pay was -- it was more

22   than just the reduction in pay.

23   Approximately without looking at the

24   math, maybe there was less than a

25   thousand dollar difference.

 **Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308 - 330.253.8119

184

1                        CERTIFICATE

2        .

3    State of Ohio,        )      SS.:

4    County of Cuyahoga.  )

5              I, Margaret Elmo, a Notary Public

6    within and for the State of Ohio, duly

7    commissioned and qualified, do hereby

8    certify that the within named witness,

9    was duly sworn to testify the truth, the

10   whole truth and nothing but the truth in

11   the cause aforesaid; that the testimony

12   then given by the witness was by me

13   reduced to stenotypy in the presence of

14   said witness; afterwards transcribed,

15   and that the foregoing is a true and

16   correct transcription of the testimony

17   so given by the witness.

18             I do further certify that this

19   deposition was taken at the time and

20   place in the foregoing caption

21   specified.

22             I do further certify that I am

23   not a relative, counsel or attorney for

24   either party, or otherwise interested in

25   the event of this action.

 Cefaratti Group
THE LITIGATION SUPPORT COMPANY

1.800.694.4787    www.cefgroup.com    fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119

185

1          I am not, nor is the court

2    reporting firm with which I am

3    affiliated, under a contract as defined

4    in Civil Rule 28 (D).

5          IN WITNESS WHEREOF, I have

6    hereunto set my hand this ____29th_____ day of

7    _____October_____ , 2021.

8    .

9    .

10   .

11   .

12   _____

13          Margaret Elmo, Notary Public

14          within and for the State of Ohio

15   .

16   .

17   .

18        My commission expires

19        November 17, 2022.

20   .

21   .

22   .

23   .

24   .

25   .

**Cefaratti Group**
THE LITIGATION SUPPORT COMPANY

1.800.694.4787      www.cefgroup.com      fax: 216.687.0973
Cleveland: 4608 St. Clair Avenue, Cleveland, OH 44103  -  216.696.1161
Akron: 140 S. Main Street, Suite 1445, Akron, OH 44308  -  330.253.8119