# Department of Veterans Affairs

# Memorandum

Date: March 21, 2018

From: Jessica Minnich, HR Specialist, VA Regional Office, Cleveland, Ohio
Rodney Brown, VISN 10 EEO Manager/ADR Coordinator, Northern Indiana HCS
John Adams, Staff Attorney, Office of General Counsel, Midwest District East

Subj: Administrative Investigation Board (AIB) Report
Alleged Inappropriate Conduct by Lora Freier Heckler, Assistant Chief, Logistics Service

To: Medical Center Director, 00(W)

## 1.  AUTHORITY:

This Administrative Investigation Board (AIB) has completed its investigation as directed by your memorandum dated January 19, 2018.

## 2.  PURPOSE & SCOPE:

The Board was convened to investigate allegations that Cleveland Veterans Affairs Medical Center, Logistics Assistant Chief Lora Freier-Heckler created a hostile work environment by engaging in bullying, threatening, and other unprofessional behaviors. More specifically, the Board investigated the following alleged inappropriate actions:

a.  Whether or not Dr. Freier-Heckler gave unauthorized preference or advantage to employees in the hiring process;

b.  Whether or not Dr. Freier-Heckler made negative comments to employees about other members of the management team;

c.  Whether or not Dr. Freier-Heckler engaged in inappropriate behavior towards or involving Chavtz Seals during a meeting on October 18, 2018;

d.  Whether or not Dr. Freier-Heckler engaged in inappropriate behavior towards or involving Christine Hicken;

e.  Whether or not Dr. Freier-Heckler engaged in inappropriate behavior towards or involving Valencia Arrington;

f.  Whether or not Dr. Freier-Heckler inappropriately granted 59-minutes of excused absences to employees;

g.  Whether or not Dr. Freier-Heckler inappropriately allowed children to be present in the workplace;

h.  Whether or not Dr. Freier-Heckler inappropriately sent an email to staff notifying them they were recommending employees for a special contribution award;

GOVERNMENT
EXHIBIT
3

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

 

    i.  Whether or not Dr. Freier-Heckler engaged in inappropriate behavior during Radiology Training; and

    j.  Whether or not Dr. Freier-Heckler inappropriately discussed EEO Complaints with employees.

**3. EXHIBITS:**

    a.  AIB Charge Memorandum (January 19, 2018);

    b.  Temporary Assignment of Duties (January 11, 2018);

    c.  Letter from Logistics Staff to Associate Director Beth Lumia (January 17, 2018);

    d.  Report of Contact from Darryl Johnson (January 9, 2018);

    e.  Report of Contact from Christine Hicken (December 13, 2017);

    f.  Email, Subj: FW: ROC on Lora Freier-Heckler (January 5, 2018);

    g.  Attachment to f: Report of Contact from Christine Hicken (January 4, 2018);

    h.  Report of Contact from Christine Hicken (January 5, 2018);

    i.  Letter from Valencia Arrington to Associate Director Lumia (January 4, 2018);

    j.  Email from Darlene Estelle, Subj: MEETING WITH LOGISTICS (December 27, 2017);

    k.  Email from Robin Horn, Subj: ROC (January 4, 2018);

    l.  Documentation regarding Radiology training (October 30 and 31, 2017);

    m.  Documentation regarding Valencia Arrington's leave on August 9, 2017;

    n.  Documentation concerning Valencia Arrington's performance on the driver daily log;

    o.  Logistics Service Organizational Chart and Roster (November 10, 2016 and November 29, 2017);

    p.  Incentive Awards Recommendation and Approval (VA Form 4659) (January 5, 2018);

    q.  Employee Responsibility and Conduct, Medical Center Policy 005-024 (July 1, 2016);

    r.  Absence and Leave…, Medical Center Policy 005-007 (March 21, 2017);

    s.  Employee Recognition and Awards, Medical Center Policy 005-037 (September 23, 2015);

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

t.   Documents submitted by Dr. Freier-Heckler during her testimony;

u.   Map of the Logistics Section Main Office;

v.   Letter from Dr. Freier-Heckler's Attorney re: Christmas Tree Purchase (February 12, 2018);

w.   The Equal Employment Opportunity, Diversity and Inclusion, No FEAR, and Whistleblower Rights and Protection Policy Statement (July 5, 2017);

x.   Establishment of Anti-Harassment Office (VAIQ# 7564784) (February 12, 2015);

y.   Email from Robert Conkey re: Radiology Training Schedule (March 14, 2018);

z.   Document, RE: Lora Freier-Heckler, Administrative Investigation Board (March 6, 2018);

aa.  Text Exchange between Chavtz Seals and Dr. Freier-Heckler (October 14, 2017);

bb.  AIB Documentation Memo from Dr. Freier-Heckler, signed by Jessica Pettinato (March 7 2017); [1]

cc.  Requested Report of Contact regarding Mr. Seals (Various, Submitted on March 7, 2018)

dd.  59 Minutes – Is it an Award or Isn't It?, Article from Employee Relations & Performance Management Newsletter (September/October 2015);

ee.  Testimony of Freier-Heckler, Ph.D., Assistant Chief, Logistics Service;

ff.   Changes to Dr. Freier-Heckler's testimony (March 6, 2017);

gg.  Testimony of  Philip Rutledge II, Chief, Logistics Service;

hh.  Testimony of  Danella Felder, Administrative Officer;

ii.   Testimony of  Robert Conkey, Management & Program Analyst;

jj.   Testimony of Richard Standing, Program Support Assistant;

kk.  Testimony of  Jose "Mario" Serrano, Chief, Materials Management;

ll.   Testimony of Christine Hicken, Inventory Management Specialist;

mm.    Testimony of  Shelly Gill, Inventory Management Specialist;

nn.  Testimony of  Shirley Hammond, Inventory Management Specialist;

oo.  Testimony of  Melissa Kasper, Inventory Specialist Supervisor;

---

[1] Dr. Freier-Heckler submitted Exhibits v, z, aa, bb, cc and ee to Risk Management on March 7.  Exhibit cc regarding Mr. Seals is 429 pages and not relevant to the scope of this investigation.

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

pp. Testimony of   Dustin Medure, Supervisor, Warehouse Foreman;

qq. Testimony of   Craig Ringo, Material Handler;

rr.   Testimony of Chavtz Seals, Supervisor, Transportation Section (Former);

ss. Testimony of   Darryl Johnson, Lead Motor Vehicle Operator;

tt.   Testimony of   Valencia Arrington, Lead Motor Vehicle Operator;

uu. Testimony of   Alison Pryce, MD;

vv. Testimony of Timothy Powell, Radiology Tech;

ww.   Testimony of Brendan Kelly, Tools and Parts Attendant;

xx. Testimony of John Elliott, VISN 10 Energy and Fleet Manager;

yy.   Testimony of Robin Horn, Human Resources Specialist; and

zz. Testimony of Darlene Estell, President, AFGE Local 31.


## 4.  BACKGROUND

All witnesses work at the Louis Stokes VA Medical Center in Logistics and Radiology Services.

Philip Rutledge and Lora Freier-Heckler, Ph.D., are Chief and Assistant Chief of Logistics Service, which is composed of approximately 110 employees in 7 different sections.  Dr. Freier-Heckler reports to Mr. Rutledge as her immediate supervisor.  For the period from around June 2017 to January 11, 2018, in combination with Mr. Rutledge, Dr. Freier-Heckler was responsible for the managerial oversight of the entire service.

Dr. Freier-Heckler directly supervised the following section chiefs, among others:

| Section | Chief |
| --- | --- |
| Material Management | Mario Serrano, Chief, Materials Management |
| Warehouse | Dustin Medure, Supervisor, Warehouse Foreman |
| Transportation | Chavez Seals, Transportation Supervisor[2] |

The non-supervisory, non-managerial employees in Logistics Service are represented by American Federation of Government Employees (AFGE), Local 31.

---

[2] Mr. Seals was detailed or reassigned out of the position of Fleet Manager on October 31, 2017, and Mr. Medure is acting in his position.  (Seals, 27:24-28:2, Medure 4:10-11)

4

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

## 5.  FACTS, ANALYSES & CONCLUSIONS

Given the scope of the investigation, the facts, analysis and conclusions of each allegation will be addressed separately below.

### a.  Whether or not Dr. Freier-Heckler gave unauthorized preference or advantage to employees in the hiring process;

Reports of contact and various witnesses allege, Dr. Freier-Heckler gave unauthorized preference or advantage in the hiring process to Brendan Kelly, Dustin Medure and Darryl Johnson.[3]

#### Facts

##### (1)  Advantage to Branden Kelly

In a January 17, 2018 letter to Associate Director Beth Lumia, approximately 16 employees alleged that Environmental Management Service (EMS) employee Branden Kelly was given unauthorized preference or advantage in his application for the Lead Warehouse position. (Exhibit c)

The letter indicated that supervisor Mr. Medure, an interview panel member, was "friends" with Mr. Kelly and that Mr. Kelly was "prepped/instructed" on interview techniques and resume creation by Mr. Medure and Dr. Freier-Heckler.

None of the witnesses provided a factual basis for the allegations aside from their observation that existing Warehouse employees were more experienced than Mr. Kelly.  (Exhibit c, Hicken, 71:23-75:3, Ringo 5:8-8:7)

The allegations of assistance during the application and interview process were denied by Mr. Kelly, Mr. Medure. (Kelly 11:1-117:10, Medure, 53:22-54:12)  Dr. Freier-Heckler has only communicated with Mr. Kelly in passing. (Freier-Heckler 203:23-204:21, 229:20)  Mr. Serrano was on the selection panel and believes the process was appropriate. (Serrano, 19:18-23:9)

Both Mr. Kelly and Mr. Medure indicated their careers overlapped briefly in EMS and they know each other. (Medure, 50:1-14, Kelly, 8:5-17)  Mr. Kelly described having a brief conversation with Mr. Medure about applying for the position, and indicated Mr. Medure approached him around the day after his interview to talk more about the position's duties (Kelly, 14:21-15:22 19:1- 21:18)  Mr. Medure denied that the post-interview conversation occurred. (Medure, 54:13-22)

##### (2)  Advantage to Dustin Medure

In the January 17, 2018 letter to Associate Director Lumia, the employees also alleged Dustin Medure's advancement to both the Warehouse Lead position and his supervisory position was inappropriate. (Exhibit c)

---

[3] The Board was asked to investigate whether or not Dr. Freier-Heckler gave unauthorized preference or advantage in the hiring process, and did not conduct and inquiry into whether or not the selection or placement of these employees into positions was appropriate.

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

None of the witnesses provided a factual basis for the allegations aside from their observations that existing Warehouse employees were more experienced than Mr. Medure. (Hicken 75:4-77:20, Ringo 5:8-8:7)

The allegations of assistance during the application and interview process were denied by Mr. Medure and Ms. Freier-Heckler (Medure 11:14-21, Freier-Heckler 84:19-85:25)  Mr. Rutledge confirmed Mr. Medure was selected for promotions through the competitive processes. (Rutledge 87:5-88:13)

(3) *Advantage to Darryl Johnson*

In October 2017, Darryl Johnson and Valencia Arrington were the two Lead Motor Vehicle Operators in the Transportation section. Mr. Johnson reported, Dr. Freier-Heckler solicited him to be the Acting Transportation Supervisor on October 26, 2017 (Exhibit d, Johnson 28:6-16) He described Dr. Freier-Heckler asking if he was interested in the acting position and directing him to send his resume to her so that it could be updated with needed information and forwarded to Human Resources.  Mr. Johnson indicated he was not interested in the position.[4] (Exhibit d, Johnson 30:14-19, 32:5-11, Freier-Heckler, 16:5-17 and 69:9-73:13)

Dr. Freier-Heckler said she and Mr. Rutledge "tried to vet" Mr. Johnson to be Acting Transportation Supervisor, but he repeatedly declined. (Freier-Heckler 69:18-20)

Article 12, Section 1(D) of the AFGE Master Agreement requires soliciting qualified volunteers when offering noncompetitive details of 10 consecutive workdays or more. There is no indication that both lead motor vehicle operators or all transportation employees were solicited for a noncompetitive detail/temporary promotion in accordance with the Agreement.

### Conclusions

The investigation disclosed no evidence aside from employee conjecture that Dr. Freier-Heckler or any other management official gave unauthorized preference or advantage in the hiring process to Branden Kelly or Dustin Medure. No one identified an error or inappropriate conduct in the selection process.

On the other hand, it was arguably inappropriate to target Darryl Johnson for the temporary detail/promotion to Acting Warehouse Supervisor without following the formal process outlined in the Master Agreement and soliciting all qualified staff.

### Recommendations

Logistics supervisors including Mr. Rutledge, Dr. Freier-Heckler and Mr. Medure should be reminded of the noncompetitive detail and temporary promotion procedures and the merit promotion procedures outlined in the Master Agreement, and advised to refrain from conversations with employees regarding vacancies that are outside of the formal processes, or may give the appearance of favoring one candidate over another before a selection is made and announced.

---

[4] Mr. Johnson also alleges, during this same conversation, that Dr. Freier-Heckler threatened him regarding not telling anyone about negative comments she made concerning Mr. Rutledge and Mr. Seals. (Exhibit d, Johnson 27:19-28:5)  Dr. Freier-Heckler denies this (Freier-Heckler, 75:31-24).  The Board would not recommend pursuing action over this alleged exchange.

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

**b. Whether or not Dr. Freier-Heckler made negative comments to employees about other members of the management team;**

**Facts**

Almost every witness testified that Dr. Freier-Heckler made negative comments to subordinate staff concerning other management officials on a frequent basis. Here are the specific incidents identified:

*(1) December 12, Transportation Staff Meeting*

On December 12, 2017, there was a Transportation staff meeting held by Mr. Medure and Dr. Freier-Heckler.  AFGE Local 31 President Darlene Estelle and Labor Relations Specialist Robin Horn were also in attendance.  The meeting involved considerable conflict between the management officials, the Union and the warehouse staff during which Dr. Freier-Heckler engaged in a conflict with the Union and HR in front of her subordinate staff.[5]

Ms. Estelle and Ms. Horn both testified that Dr. Freier-Heckler made negative comments about Mr. Rutledge and Mr. Seals during the meeting including:

- Repeatedly indicating that she (Dr. Freier-Heckler) was fixing or correcting all of the things that Mr. Rutledge and Mr. Seals had implemented/done wrong; and

- Saying that Mr. Rutledge and Mr. Seals didn't do their jobs, and that she was fixing things, and no one was giving her credit. (Exhibits j and k, Estelle 13:8-14:12, Horn 22:17-23:18)

Mr. Johnson reported Dr. Freier-Heckler said the group wouldn't be in this mess if it wasn't for Mr. Rutledge and Mr. Seals, and she has been trying to clean up this mess ever since she got here.  (Johnson 18:18-19:5)

Mr. Medure confirmed the meeting involved a loud conflict (Medure, 27:25 - 30:4) He said there was no mention of Mr. Rutledge or Mr. Seals during the meeting, except for a discussion about Mr. Rutledge not attending the meeting. He indicated that Dr. Freier-Heckler referenced things being done incorrectly but that she did not place blame on Mr. Rutledge or Mr. Seals. (Medure 20:19-21:12, 26:17-24:24)

Dr. Freier-Heckler denies making any negative comments about Mr. Rutledge or Mr. Seals during the meeting.  (Freier-Heckler, 94:17-96:24)

*(2) Miscellaneous Comments*

Witnesses testified, Dr. Freier-Heckler told employees the reason why they did not get their GS-9s sooner was because of Mr. Rutledge (Hicken 20:19-21:7, Hammond, 21:18-22:4).

---

[5]  This meeting was a formal discussion (5 USC 7114, Section 2(B)). At the time of their testimony, neither Dr. Freier-Heckler nor Mr. Medure was familiar with the concept of a formal discussion or the roles and obligations of union and management in formal discussions. (Freier-Heckler 90:5-21, Medure 40:13-16)  Management's education in this regard, may have effectively eliminated much of the conflict during this meeting.

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

According to Dr. Freier-Heckler, she didn't tell employees that Mr. Rutledge was holding up their GS-9s, but rather employees shared that with her.   (Freier-Heckler, 148:8-151:16)

Ms. Gill and Ms. Hicken both reported Dr. Freier-Heckler telling them that she had Mr. Rutledge "by the balls,"  after Dr. Freier-Heckler returned from her detail to EMS.  (Hicken 19:7, 20:14-17, Gill 8:9-20)

Mr. Conkey described Dr. Freier-Heckler questioning Mr. Rutledge's processes in a critical manner (Conkey, 15:6-17:24).

*(3) Dr. Freier-Heckler's Response*

Although Dr. Freier-Heckler denies these direct allegations, she admitted in her testimony that she has been critical of Mr. Rutledge and Mr. Serrano with subordinate staff, stating:  "But I have told these employees they do not respect Mario. They walk all over him because he lets them. They do not respect Phil. They walk all over Phil because he lets them. No one has ever MF'd me like they do them, never since I've been there." (Freier-Heckler, 152:15-21)

Furthermore, whether she recognized her language was unnecessarily critical or not, during her testimony, Dr. Freier-Heckler had a focus on her personal accomplishments in successfully "cleaning up" and being tasked to "clean up" different sections of the medical center:

- "I have tried everting in my power every day that I've been there to clean up everything." (Freier-Heckler, 177:1-4)

- "The difference between before and now is the front office backed me every step of the way with whatever section I had to clean up." (Freier-Heckler 181:9-11)

- "…the director of his hospital has trusted me with the controlled substance programs, about 15 different areas I've cleaned up for her that I reported directly to her, and three of them are like the top three things…" (Freier-Heckler 199:15-24)

- "I'm the one tasked with cleaning up the mess, and if they didn't want the mess cleaned up, then they should[n't] have tasked me with it." (Freier-Heckler 216:6-10)

- "…when the director tells me to go to the service and, quote, unquote, clean up that shit, again, I have cleaned up many areas in the hospital, I could name 15 off the top of my head that I've went in and cleaned up a mess…" (Freier-Heckler 53:10-15)

The Board notes that Dr. Freier-Heckler's accomplishments and traits were also recognized by her supervisor.  Mr. Rutledge, testified that Dr. Freier-Heckler is extremely bright and well organized. (Rutledge 100:15-16)  Further, Dr. Freier-Heckler is extremely good at data mining and analysis and that her performance in these areas rivals anybody that he has seen. (Rutledge 36:8-14)

**Conclusion & Recommendation**

Dr. Freier-Heckler repeatedly made negative and inappropriate comments to subordinate employees about Service Chief Rutledge and Supervisor Seals, including but not limited to the specific occasions above.  The Board credits the testimony of Mr. Johnson, Ms. Estell and Ms.

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

Horn regarding the nature of Dr. Freier-Heckler's conduct during the December 12 meeting, because the testimony is consistent. Furthermore, Mr. Medure and Dr. Freier-Heckler also both indicated there was conflict during the meeting.

Appropriate administrative action should be taken against Dr. Freier-Heckler for being unprofessional in her criticisms of Mr. Seals and Mr. Rutledge in the presence of subordinate staff, and for engaging in an inappropriate conflict in the presence of subordinate staff during the December 12 meeting.

Regarding the miscellaneous comments, the Board credits Ms. Hicken, Ms. Gill and Mr. Conkey's descriptions of Dr. Freier-Heckler's statements as described, although would  not recommend pursuing formal action in regards to the misconduct as the date and time of the comments is uncertain and there are no corroborating witnesses.

### c. Whether or not Dr. Freier-Heckler engaged in inappropriate behavior towards or involving Chavtz Seals during a meeting on October 18, 2017;

#### Facts

On October 18, 2017, Dr. Freier-Heckler held a meeting with the following employees concerning a project related to updating fiscal year 2017 fleet management records:

    Danella Felder, Administrative Officer;
    Bob Conkey, Management & Program Analyst;
    Valencia Arrington, Motor Vehicle Operator;[6]
    Darryl Johnson, Motor Vehicle Operator;
    Julia Sifford, Supply Technician;[7]
    Chavez Seals, Supervisory Motor Vehicle Operator; and
    Christie Hicken, Inventory Management Specialist.

A portion of the meeting involved a conference call with VISN 10 Energy and Fleet Manager John Elliot. Witnesses allege that Dr. Freier-Heckler engaged in inappropriate conduct, towards or concerning  Mr. Seals during the meeting in a variety of ways.

*(1) Responding to Mr. Seals Leaving the Meeting*

Mr. Seals left the meeting to retrieve a document without announcing why he was leaving.  All interviewed witnesses, with the exception of Ms. Felder, indicated that Dr. Freier-Heckler followed Mr. Seals out the door and asked what he was doing.  Their accounts are as follows:

- **Christie Hicken:** Dr. Freier-Heckler yelled down the hall, "Where the fuck do you think you're going?  Did you just walk out on me/my meeting. You better hurry up and get back here," or words to that effect; (Exhibit e, Hicken, 11:11-12:08);

---

[6] Ms. Arrington was recently reassigned to a different service.

[7] Ms. Sifford was not interviewed.

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

- **Valencia Arrington:** Dr. Freier-Heckler walked out the door and said, "You just walked the hell out of my meeting like that? You don't walk out of my damn meeting like that." (Arrington, 36:8-23)

- **Darryl Johnson:** Dr. Freier-Heckler said "Where the hell is he going?" when Mr. Seals left the room.  Dr. Freier-Heckler went to the door and asked Mr. Seals where he was going/what was he doing.  (Johnson, 12:3-9)

- **Chavtz Seals:** Dr. Freier-Heckler screamed down the hall, "Chavtz, you walked out of my meeting. Where are you going?" (Seals, 19:21-20:6, 37:17-38:18)

- **Robert Conkey:** Dr. Freier-Heckler followed Mr. Seals out the door, but Mr. Conkey didn't hear what was said.  He believes it was something like, "What are you doing?" (Conkey, 14:11-15:5)

Dr. Freier-Heckler indicated she followed Mr. Seals into the hallway and asked, "Where are you going, we need you," or words to that effect, and that she did not yell or swear during the exchange. (Freier-Heckler, 26:24-27,28:12-29:4, 34:8-37:17)

Mr. Johnson, Ms. Hicken and Ms. Arrington said that Dr. Freier-Heckler used foul language when she was calling to Mr. Seals.  Mr. Conkey, and Dr. Freier-Heckler indicated that she did not use foul language. Mr. Seals said he doesn't recall if Dr. Freier-Heckler swore. (Citations immediately above.)

*(2)  Responding to a document provided by Mr. Seals;*

When Mr. Seals returned to the meeting room, he presented Dr. Freier-Heckler with a document and she was not pleased with its contents.  Accounts concerning her response are as follows:

- **Valencia Arrington**: Dr. Freier-Heckler tossed the papers back and him and asked, "What the hell?" or "What the fuck?"  (Arrington, 37:1-38:18)

- **Darryl Johnson**: Dr. Freier-Heckler said, "This is not what I'm looking for."  (Johnson, 12:13-15)

- **Chavtz Seals**: Dr. Freier-Heckler said, "This doesn't tell me [any]thing." (Seals, 20:7-10)

- **Robert Conkey**: Under her breath, looking down, Dr. Freier-Heckler said, "Shit, what the hell is this? There is nothing on here," or words to that effect. (Conkey, 14:1-10)

Dr. Freier-Heckler indicated she looked at the document and said, "What the hell is this shit," under her breath. (Freier-Heckler, 34:8-37:17)

*(3)  Commenting on Mr. Seals' Performance*

Witnesses, including Dr. Freier-Heckler, testified that she made negative comments about Mr. Seals' performance during the meeting.

- Dr. Freier-Heckler testified she told the group that Mr. Seals didn't do what he needed to do. (Freier-Heckler, 30:14-25)

10

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

- According to Mr. Conkey, Dr. Freier-Heckler also voiced to Mr. Seals, words to the effect of, "If you'd have been doing your job for the last year, we wouldn't be in this situation." (Conkey, 12:19-13:9)

- Mr. Seals reported, Dr. Freier-Heckler asked him, "What are you supposed to be doing? What are you responsible for? (Seals, 20:23-25)

    *(4) Comments about Going Toe-to-Toe with Mr. Seals*

Witnesses Hicken and Johnson both indicated Dr. Freier-Heckler talked about Mr. Seals going toe-to-toe with her:

- **Hicken**:  Dr. Freier-Heckler said to Mr. Seals, "You're not going to go toe-to-toe with me on this, I'm a straight shooter." (Hicken, 11:11-20)

- **Johnson**: When Dr. Freier-Heckler came back to the table she said, "I'm not going to go toe-to-toe with Chavtz, he's going to do what I tell him to do." (Johnson, 12:7-12)

Dr. Freier-Heckler indicated during her testimony that Mr. Seals wanted to go toe-to-toe with her. (Freier-Heckler, 28:21-29:4, 34:22-35:7)

Mr. Elliott did not overhear any inappropriate conduct during the meeting. (Elliot, 12:14-13:24)

### Analysis & Conclusion

While witness accounts differ in minor details, they are consistent related to Dr. Freier-Heckler engaging in inappropriate behavior towards Mr. Seals during the October 18 meeting.

The Board credits Mr. Seals', Mr. Conkey's and Dr. Freier-Heckler's version of the events related to Dr. Freier-Heckler following Mr. Seals out the door to ask where he was going as Mr. Seals was the recipient of the communication and had no reason to downplay the content of Ms. Freier-Heckler's statements. Mr. Johnson's testimony is consistent with the testimony of these witnesses aside from inserting the word "hell" in Dr. Freier-Heckler's communication. Ms. Hicken and Ms. Arrington were the only witness that reported Dr. Freier-Heckler using the word fuck and damn. Given the disparity between Ms. Hicken and Ms. Arrington's testimony with that of the other witnesses we find Ms. Hicken and Ms. Arrington to be exaggerating.

The Board finds Dr. Freier-Heckler's response to Mr. Seals submitting a document during the meeting, Dr. Freier-Heckler's negative comments regarding Mr. Seals' performance, and Dr. Freier-Heckler's comments about Mr. Seals wanting to go toe-to-toe (or that she was not going to go toe-to-toe with him) to be inappropriate conduct particularly because the statements were made in the presence of subordinate employees.

### Recommendation

Appropriate administrative action should be taken regarding Dr. Freier-Heckler's unprofessional conduct during the October 18 meeting.

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

**d. Whether or not Dr. Freier-Heckler engaged in inappropriate behavior towards or involving Christine Hicken;**

Ms. Hicken has made a number of allegations concerning one-on-one conversations regarding Dr. Freier-Heckler.[8] The Board does not find it necessary to draw conclusions on the one-on-one conversations as neither Ms. Hicken nor Dr. Freier-Heckler are reliable witnesses. More specifically,  Ms. Hicken testimony regarding Dr. Freier-Heckler's conduct in the October 18 meeting was found to be exaggerated (see above) and Dr. Freier-Heckler has been discredited at various times in the investigation.

**Facts & Conclusions**

The Board will make conclusions concerning the following allegations involving Ms. Hicken:

*(1)  Dr. Freier-Heckler Yelling at Mr. Seals Concerning Saturday October 14 Overtime*

Darryl Johnson and Christie Hicken describe Dr. Freier-Heckler yelling at Ms. Seals over the phone on Saturday, October 13, 2017, concerning his decision to bring Ms. Hicken in for Saturday overtime. (Johnson 10:11-11:10, Hicken 28:11-25)

According to Mr. Johnson, Dr. Freier-Heckler and Mr. Seals were yelling back and forth and Mr. Seals had Dr. Freier-Heckler on speaker phone. (Johnson 10:11-11:10)  Mr. Johnson testified the conversation ended with Dr. Freier-Heckler saying that Mr. Seals was being "insubordinat[e]." (Johnson, 11:18-24)  Mr. Seals described Dr. Freier-Heckler as, "Getting really loud" over the phone with him and having a negative tone during the call. (Seals, 10:9-13)

Dr. Freier-Heckler provided a text exchange she had with Mr. Seals before the call. (Exhibit aa). She indicated Mr. Seals was having a "tantrum because he wants to be in charge."  She said Mr. Seals "wanted to yell on the phone and… berate" her.  She said "that was not going to happen" so she told Mr. Seals he was borderline being insubordinate. Dr. Freier-Heckler described her voice as having a professional tone and being one level above a professional volume. (Freier-Heckler, 56:1-16)

As all witnesses except for Dr. Freier-Heckler describe her as yelling, the Board concludes Dr. Freier-Heckler was inappropriately yelling at Mr. Seals on the phone during the morning of October 13, 2017.

*(2) November 29 Conversation*

Ms. Hicken alleges Dr. Freier-Heckler yelled in her office, "If you fucking walk out that door, don't you ever fucking come back." (Exhibit e, Hicken 22:7-14) Shirley Hammond and Shelly Gill overheard the exchange.  Ms. Hammond indicated she heard Dr. Freier-Heckler tell Ms. Hicken to, "Get the fuck out of my office, don't come back," in a loud and forceful way. (Hammond, 7:16-10:6) Ms. Gill reported hearing Dr. Freier-Heckler tell Ms. Hicken to, "Get the fuck out of my office, I don't want to hear it." (Gill, 18:17-19:5)

---

[8] These include, among other things, Dr. Freier-Heckler calling Ms. Hicken "the mean lady," and placing undue pressure on Ms. Hicken to order an artificial Christmas tree. (Exhibit e, f, g & ll) The artificial tree order was ultimately approved by Mr. Serrano and appears to be an inappropriate purchase, related to both the narrative justification for the order and an excessive delivery fee.

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

Dr. Freier-Heckler admits to having a louder conversation with Ms. Hicken in her office before Christmas. She did not comment about swearing at Ms. Hicken, but indicated swearing was common in the workplace. (Freier-Heckler, 153:10-155:5) This was confirmed by Mr. Conkey. (Conkey, 35:20-38:9).

The Board finds the testimony of Ms. Hicken, Ms. Hammond and Ms. Gill to be consistent enough to conclude that Dr. Freier-Heckler raised her voice and used foul language when Ms. Hicken was in her office on or around November 29, 2017.

### Recommendation

Appropriate administrative action should be taken regarding Dr. Freier-Heckler yelling at Mr. Seals on October 14, 2017.

Appropriate administrative action should be taken regarding Dr. Freier-Heckler raising her voice and using foul language with Ms. Hicken on or around November 29, 2017.

Management should remind Logistics employees regarding its employee responsibilities and conduct policy, advise employees that using foul language is not courteous or respectful behavior, and advise employees that the policy will be enforced going forward.

### e. Whether or not Dr. Freier-Heckler engaged in inappropriate behavior towards or involving Valencia Arrington;

Ms. Arrington alleges Dr. Freier-Heckler was involved in the following inappropriate actions:

(1) Denying Ms. Arrington's compensatory time for August 9, 2017;

(2) Issuing a report of contact to Ms. Arrington on December 6, 2017; and

(3) Detailing Ms. Arrington to be a telephone operator on or around December 18, 2017. (Exhibit i)

Ms. Arrington's leave for August 9 was initially denied by Mr. Seals, but ultimately approved by Mr. Serrano. (Exhibit m, Arrington, 21:13-23) Ms. Arrington's report of contact was issued by Mr. Medure for documented performance deficiencies. (Exhibit n, Medure: 45:10-47:5)  Ms. Arrington's detail was made in connection with a reasonable accommodation request for reassignment (Arrington 70:10-71:2).

As such, the Board does not find any of the three issues concerning Ms. Arrington to directly involve Dr. Freier-Heckler.

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

**f.  Whether or not Dr. Freier-Heckler inappropriately granted 59-minutes of excused absences to employees;**

**Facts**

Dr. Freier-Heckler testified to her belief that she was authorized to grant 59 minutes before a holiday "or any other time when management deems fit" and "management can give 59 minutes whenever they want." (Freier-Heckler, 173:2-175:6). Dr. Freier-Heckler indicated she grants 59-minutes to all employees related to a holiday and those that are unable to take 59 minutes may take 59 minutes the next workday. (Freier-Heckler, 164:1-19)

While the Christmas party was not immediately before a holiday, Dr. Freier-Heckler also granted 59 minutes to those employees that attended the Christmas party, by notifying them at the party of the authorization to take 59 minutes. (Freier-Heckler, 166:7-166:14)  Although 59- minutes was not granted to employees who did not attend the party, Dr. Freier-Heckler didn't seem to consider that some employees did not attend. (Freier-Heckler, 166:15-167:23, Johnson, 24:25-25:20)

Mr. Rutledge testified, Dr. Freier-Heckler authorized 59 minutes service-wide for 3 days in a row while he was on leave: December 27, 28, and 29, 2017.  December 29 was the only workday immediately before a Federal holiday.[9] (Rutledge, 39:23-40:13)

Ms. Freier-Heckler authorized 59-minutes to recognize employee accomplishments (Conkey, 25:16-19).  Mr. Rutledge testified to granting 59-minutes to recognize employees that worked projects after hours (i.e. came in early and stayed late.) (Rutledge, 39:8-22)

Allegations were made by Christie Hicken that Mr. Bob Conkey was granted 59 minutes for responding correctly to a reindeer trivia question, however, Mr. Conkey was not granted the 59 minutes.  (Conkey, 27:11-28:22, Freier-Heckler, 169:20-170:14, Serrano, 11:5-12:10) Both Mr. Conkey and Dr. Freier-Heckler perceived the offer of 59-minutes in that instance to be a joke.

At Dr. Freier-Heckler's direction, 59 minutes of excused absences were also given to recognize employee birthdays. (Conkey, 25:11-26:14)

**Policy**

The granting of 59 minutes as a form of award or recognition is not in accordance with VA policy. (See Exhibit dd) VA Directive 5011, provides supervisors with the authority to authorize up to 59 minutes of excused absence for "unavoidable or necessary absence from duty and tardiness of less than 1 hour … when the reasons for the absence appear to be adequate to the leave approving official." (VA Directive 5011, Part III, Chapter 2, paragraph 12(f))  Authorized absence may also be provided in proximity to Federal holidays when…"the basis for excusing the employee is fairly consistent with prevailing practices of the Federal establishments in the area concerning the same or similar activities." (VA Directive, Part III, Chapter 2, Paragraph 12 (a))

---

[9] Mr. Rutledge indicated he found Dr. Freier-Heckler's frequent use of 59 minutes to be inappropriate and he reported the matter to Human Resources.  He stated he did not address the issue with Dr. Freier-Heckler directly because he was told not to engage with her in or around June 2017, when she returned to the Service. (Rutledge, 41:1-42:6)

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

### Conclusion

Both Mr. Rutledge and Dr. Freier-Heckler inappropriately granted 59 minutes as a form of award or recognition. Dr. Freier-Heckler granted 59-minutes with excessive frequency and did not ensure that all employees had knowledge of the ability to use 59 minutes.

### Recommendation

Medical Center management should set and communicate clear guidelines for supervisory and managerial staff regarding the use of 59 minutes to ensure 59 minutes are being used in accordance with VA policy.

Regarding Mr. Rutledge giving 59 minutes to employees working off the clock, Logistics Service management should be educated concerning "suffer and permit" overtime liability.

### g. Whether or not Dr. Freier-Heckler inappropriately allowed children to be present in the workplace;

### Facts

On or around December 21, 2017, Richard Standings brought his two young children to work. The children were present for the bulk of the workday. Mr. Standing did not have childcare because his ex-wife was unavailable and school was out of session for the holiday.  (Standing 10:20-12:6) Dr. Freier-Heckler, Dustin Medure and Phil Rutledge gave approval for Mr. Standing to bring the kids to work. (Standing 10:20-12:6, Freier-Heckler 128:25-133:5)

According to Dr. Freier-Heckler, the rationale for approving Mr. Standing's children to be present was related to the need for him to complete a report and the fact that other employees, have had children in the workplace on various and repeated occasions.  (Freier-Heckler 130:10-132:13) The Board confirmed Mr. Rutledge, Mr. Seals and Ms. Kasper have had their children in the workplace. (Rutledge 78:14, Seals, 49:1-50:14) More specifically, Mr. Rutledge had his 8-year-old son present on various occasions during the summer of 2012, with the knowledge of Darwin Goodspeed, the Deputy Director at the time. (Rutledge, 78:14 – 82:3)

The Board requested the Medical Center's policy regarding children and other visitors in the workplace and has not received one.

### Conclusions

While the Medical Center may not have a policy regarding employee family members and other visitors, the  Board finds it to be highly inappropriate and a potential liability to have the children of employees present in the workplace.

Because the presence of employee visitors distracts employees from their duties, and could cause privacy violations, among other things, employee visitors should not be permitted in work areas except for perhaps very brief periods of time and under limited circumstances.

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

### Recommendation

The Medical Center develop, communicate and enforce a policy related to employee visitors including children in the workplace. If a policy concerning employee visitors already exists, Logistics management and staff should be reminded of the policy, and advised that it will be enforced going forward.

### h. Whether or not Dr. Freier-Heckler inappropriately sent an email to employees notifying them they were recommended for a special contribution award;

### Facts

A group of employees, led by Dr. Freier-Heckler, completed an urgent fiscal year 2017 fleet management reporting project. Dr. Freier-Heckler sent an email to the group on January 3, 2018, indicating she "processed an award" and she "processed the award for the group too" and it was "with the chief now to sign..." (Exhibit f)[10]

Dr. Freier-Heckler first prepared an Incentive Awards Recommendation and Approval (VA Form 4659), nominating each employee for a $1,000 award (Freier-Heckler 76:3-11).  Both that award recommendation, and a later 4-hour time off award recommendation, were denied. (Exhibit p)

### Conclusion

The Board concludes it was inappropriate for Dr. Freier-Heckler to advise employees of an award before the award was approved. Notifying an employee prior to final approval, introduces potential disappointment and negative feelings towards upper management if the award is ultimately denied.

The Board also finds, Dr. Freier-Heckler's focus on her action of writing the award nomination ("I processed an award for you," and "I processed the award for the group too,") does not convey the appropriate spirit of management teamwork or a unified approach to employee recognition.

### Recommendation

Dr. Freier-Heckler be counseled related to this issue, and the potential for her approach to (1) look underhanded to both employees and upper management, and (2) hurt employee morale.

### i. Whether or not Dr. Freier-Heckler engaged in inappropriate behavior during Radiology Training; and

### Facts

In October 2017, Logistics Service including Dr. Freier-Heckler, Inventory Specialist Supervisor Melissa Kasper and Denise Gaddis provided training to Radiology staff regarding interactions with vendors.  There were six sessions of the training in order to accommodate Radiology schedules. (Kasper, 9:9-11)

---

[10] One of the witnesses took exception to Mr. Chavtz Seals not being including in the award nomination. The Board finds the exclusion of Mr. Seals' to be appropriate.

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

At least two Radiology staff members, Radiologist Dr. Alison Pryce and Radiology Tech Timothy Powell were offended by Dr. Freier-Heckler's approach during the training (Exhibit I).  More specifically, Mr. Powell attended the meeting on or around October 11 (Exhibit y) and described Dr. Freier-Heckler as being condescending, accusatory, disgusted with questions, disrespectful, and confrontational/bitter. (Exhibit I, Powell 10:4-16:8) Dr. Pryce attended the meeting on October 18, and described Dr. Freier-Heckler as having a disrespectful tone and making her feel like the group was being reprimanded or chastised. She agreed with Mr. Powell's description of Dr. Freier-Heckler being condescending.  (Pryce, 8:5-13:11)

Neither Dr. Pryce nor Mr. Powell met Dr. Freier-Heckler before the training, and Dr. Pryce does not know Mr. Powell.  (Pryce, 14:14-16)

Dr. Pryce and Mr. Powell's description of Dr. Freier-Heckler's conduct is supported by Ms. Kasper whom confirmed Dr. Freier-Heckler had an attitude, aggressive tone and was condescending in responding to push-back from Radiology staff. (Kasper, 10:25-17:20) Dr. Freier-Heckler denies these allegations. (Freier-Heckler, 187:13 -191:17)

### Conclusion

Given the consistency of Dr. Pryce and Mr. Powell's testimony, the fact that they do not know each other and have never met Dr. Freier-Heckler previously, and the supporting testimony of Ms. Kaspar, the Board concludes: During Radiology training meetings on or around October 11 and October 18, 2017, Dr. Freier-Heckler did not exhibit emotional intelligence when interacting with Radiology staff and communicated in an unprofessional manner.

### Recommendation

Appropriate formal administrative action should be taken regarding Dr. Freier-Heckler's conduct during the, Radiology training meetings.

### j.  Whether or not Dr. Freier-Heckler inappropriately discussed EEO Complaints with employees.

### Facts

Various witness indicated that Dr. Freier-Heckler discussed EEO complaints with subordinate employees.

- Ms. Hicken described Dr. Freier-Heckler telling other employees about her (Freier-Heckler's)  EEO complaint against Mr. Rutledge, and indicating she was detailed to EMS as a result of her EEO Complaint.  Ms. Hicken also indicated Dr. Freier-Heckler encouraged employees to support her complaint and file complaints of their own.[11] (Hicken,16:16-20:2)

---

[11] As explained above, the Board does not fully credit Ms. Hicken's testimony as her testimony on previous allegations was embellished.  However, there does appear to be a factual basis to this testimony as it is generality supported by Ms. Kasper and Dr. Freier-Heckler's testimony (described below).

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

- Ms. Hammond testified Dr. Freier-Heckler told her that Mr. Rutledge did not like females in power and the friction between Dr. Freier-Heckler and Mr. Rutledge was because one was a male and one was a female (Hammond, 22:12 to 23:25).

- Ms. Gill indicated Dr. Freier-Heckler came to her office and said, "You're going to miss me when I'm going because Christie (Hicken) has written me up on an EEO complaint…" (Gill, 11:15-12:15, 17:14-18:16)

- Ms. Kasper indicated Dr. Freier-Heckler told her to file an EEO case against Mr. Rutledge related to Ms. Kasper not being promoted to a GS-12, and that Dr. Freier-Heckler told her to include a certain allegation in her complaint (Kasper, 30:7-36:5).[12]

- Mr. Seals described speaking with Dr. Freier-Heckler about his EEO complaint and indicated she was disturbed that he agreed to settle the complaint in mediation. (Seals 30:20-31:24)

Dr. Freier-Heckler denies encouraging employees to file EEO complaints, but admitted to discussing her own EEO complaint(s) with Melissa Kasper, a subordinate employee (two supervisor levels below Dr. Freier-Heckler). (Freier-Heckler, 100:8-15, 100:16-103:3, 97:17-100:14)

**Conclusion**

Dr. Freier-Heckler inappropriately discussed EEO Complaints with subordinate employees.

The EEOC has held it is never appropriate for an employee's EEO activity to be the subject of a general discussion. *Charlie K. v. Equal Employment Opportunity Commission*, 117 LRP 5931 , EEOC No. 0120142315 (EEOC 2017)  Furthermore, a supervisor's comments that an employee had filed a formal EEO complaint constitute a per se violation because they were likely to have a chilling effect and may deter employees from the full exercise of their EEO rights.  *King v. International Boundary & Water Commission*, 113 LRP 14450 , EEOC No. 0120112384 (EEOC OFO 2013).

**Recommendations**

Appropriate administrative action should be taken regarding Dr. Freier-Heckler commenting on and discussing employee EEO complaints.  At a minimum, Dr. Freier-Heckler should receive education and direction regarding speaking to subordinate staff regarding EEO complaints.

Appropriate training should be given to all Logistics managers and supervisors, particularly Dr. Freier-Heckler and Ms. Kasper, regarding comments about EEO activity, and properly handling an employee-initiated discussion about EEO by remaining neutral and referring the employee to the Medical Center's EEO Program Manager.

---

[12] Ms. Kasper testified she would tell an employee "to go file and EEO complaint" if he or she reported that they felt discriminated against.  (Kasper 33:2-9)

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

## 6.  SUMMARY OF CONCLUSIONS

The Board was asked to determine whether or not Dr. Freier-Heckler created a hostile work environment by engaging in bullying, threatening, and other unprofessional behaviors.

The Department of Veterans Affairs is committed to a fair, equitable, and open work environment, and promoting healthy relationships with a diverse, cooperative, supportive, and engaged workforce.

VA's Policy defines harassment as

> *any verbal or physical conduct based on race, color, religion, national origin, age, disability, sex (i .e., with or without sexual conduct), genetic information, or protected activities such as participating in Equal Employment Opportunity (EEO) activity, that either results in a tangible employment action or is so severe or pervasive as to constitute an intimidating, hostile, or offensive work environment. (Exhibit x)*

> *Harassment becomes unlawful where (1) enduring the offensive conduct becomes a term or condition of continued employment, or (2) the conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile, or abusive. (Exhibit w)*

While Dr. Freier-Heckler's conduct does not rise to the level of unlawful harassment/hostile work environment as there is no evidence it was based on race, color, religion, etc., her conduct could be classified as inappropriate workplace bullying.

The Agency's Equal Employment Opportunity, Diversity and Inclusion, No FEAR, and Whistleblower Rights and Protection Policy Statement (July 5, 2017) (Exhibit w) identifies workplace bullying as follows:

> *Bullying conduct constitutes fighting, hate messages, threats, and intention to inflict harm, or abusive, offensive, unprofessional, intimidating, slanderous, malicious, derogatory, or otherwise inappropriate or unacceptable language intended to degrade or humiliate a particular person or group of people. Bullying is a violation of VA's policy and strictly prohibited.*

The Medical Center's Employee Responsibility and Conduct Policy (Exhibit   ) defines bullying as "unwanted aggressive, demeaning behavior that involves a real or perceived power imbalance." Many of Dr. Freier-Heckler's communications described above fit into this definition.

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

## 7.  DR. FREIER-HECKLER'S ALLEGATIONS OF DISCRIMINATION

In her testimony and written response, Dr. Freier-Heckler alleges the Administrative Board of Investigation was called based on retaliation for her EEO activity, and that Mr. Rutledge and the Medical Center Director have discriminated against her. The Board did not investigate those matters as they were beyond its scope.  Nevertheless, considering this background of various EEO allegations, the Board stands by its factual analyses, conclusions and recommendations. Assuming, arguendo, that a discriminatory or hostile environment has existed for Dr. Freier-Heckler, it would not influence the facts in this investigation or excuse Dr. Freier-Heckler's misconduct.

Dr. Freier-Heckler also alleges that certain employees have banded against her in response to actions she took to hold them accountable. The Board considered this perspective when making its credibility determinations.  It views the credibility determinations to be solid because they are supported by more than one reliable witness at times including witnesses Dr. Freier-Heckler perceives to be unbiased (Ms. Kasper and Mr. Conkey).

## 8.  SUMMARY OF RECOMMENDATIONS

The Board provides the following summary of its recommendations:

a.  Setting policy, reminding and educating staff as follows:

(1) **Detail & Promotion Procedures**: Logistics supervisors including Mr. Rutledge, Dr. Freier-Heckler and Mr. Medure should be reminded of the noncompetitive detail and temporary promotion procedures as well as the merit promotion procedures outlined in the Master Agreement, and advised to refrain from conversations with employees regarding vacancies that are outside of the formal processes, or may give the appearance of favoring one candidate over another before a selection is made and announced.

(2) **Conduct Expectations:** Management should remind Logistics employees regarding its employee responsibilities and conduct policy, advise employees that using foul language is not courteous or respectful behavior, and advise employees that the policy will be enforced going forward.

(3) **Guidelines on 59-Minute Excused Absences**: The Medical Center should set and communicate clear guidelines for supervisory and managerial staff regarding the use of 59 minutes to ensure 59 minutes are being granted in a fair and equitable manner, and in accordance with VA policy.

(4) **Suffer and Permit Overtime:** Regarding Mr. Rutledge giving 59 minutes to employees working off the clock, Logistics Service management should be educated concerning "suffer and permit" overtime liabilities.

(5) **Employee Children & Visitors**: The Medical Center should develop, communicate and enforce a policy related to employee visitors including children in the workplace. If a policy concerning employee visitors already exists, Logistics management and staff should be reminded of the policy, and advised that it will be enforced going forward.

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

(6) **EEO Comments & Handling EEO Inquiries**: Appropriate training should be given to all Logistics managers and supervisors, particularly Dr. Freier-Heckler and Ms. Kasper, regarding comments about EEO activity, and properly handling an employee-initiated EEO inquiry.

b.   Taking appropriate administrative action regarding the of Dr. Freier-Heckler on the following occasions/circumstances:

(1) December 12, 2017, Transportation staff meeting:

(2) October 18, 2017, Fleet project meeting:

(3) October 17, 2017, phone call with Chavtz Seals;

(4) November 29, 2017, conversation with Christie Hicken;

(5) January 3, 2018, awards email;

(6)  October 2017, Radiology trainings; and

(7) EEO-related comments.

## 9.  FINAL RECOMMENDATIONS

a.   Logistics Service

Based upon several witness interviews, the Board notes there is a great deal of interpersonal dysfunction and negative feelings between employees and management in Logistics Service. To address these issues, the Board recommends Medical Center leadership:

(1) Engage the services of VA National Center for Organizational Development (NCOD) and work with NCOD to implement a culture change initiative such as Civility, Respect, and Engagement in the Workplace (CREW); and

(2) Provide face-to-face EEO and Alternative Dispute Resolution (ADR) training to Logistics employees that addresses, among other things, the EEO process, EEO proof requirements, hostile work environment, employee obligations, and ADR routes.

b.   Dr. Freier-Heckler

While Dr. Freier-Heckler has vast administrative education and experience, she had no experience being a first-line supervisor before she was assigned to oversee subordinate supervisors and their employees. (Freier-Heckler 233:19-235:8)

Through the testimony, the Board observed Dr. Freier-Heckler is an asset to the organization in that she is a motivated and keen problem solver whom readily identifies areas of risk and weakness and has the courage and skills to successfully address them.  However, she does not exhibit the forbearance and polish required by her position.

AIB Report - Alleged Inappropriate Conduct by Lora Freier Heckler

Dr. Freier-Heckler uses a very legalistic and brash approach to managing staff, and is apt to publically blame, become visibly agitated and communicate inappropriately. Dr. Freier-Heckler's conduct has demonstrated a significant lack of emotional intelligence, including a lack of self and relationship management. Furthermore, Dr. Freier-Heckler seems to have a self-important perspective focusing on her skills and abilities and demeaning those of others. Finally, to the Board's knowledge, she has failed to acknowledge or take responsibility for her inappropriate actions.  For these reasons, the Board would strongly caution Medical Center Management from allowing Dr. Freier-Heckler to continue performing supervisory duties.

If Dr. Freier-Heckler is to remain in a supervisory position, the Board recommends the following:

    a.  Dr. Freier-Heckler receive intense mentoring from a well-respected and experienced mid-level manager or higher, that may have similar personal tendencies as Dr. Freier-Heckler, but has become skilled at using emotional intelligence (both to manage own emotions, staff and situations);

    b.  Dr. Freier-Heckler received training on emotional intelligence and assertive supervision that involves, at least for the short term, discussing her intended approach to staff and situations before she takes action (down to the details of her approach and content regarding meetings and email communication); and

    c.  Dr. Freier-Heckler be given monthly performance coaching meetings with a manager in her chain-of-command, during which the details of her activities and performance of managing staff are discussed and she is given feedback and guidance.

RODNEY O. BROWN 543455
Digitally signed by RODNEY O. BROWN 543455
Date: 2018.03.21 15:59:28 -04'00'

RODNEY BROWN
Member

John D. Adams 1389942
Digitally signed by John D. Adams 1389942
Date: 2018.03.21 15:20:01 -04'00'

JOHN ADAMS
Member

Jessica R. Minnich 137085
Digitally signed by Jessica R. Minnich 137085
DN: dc=gov, dc=va, o=internal, ou=people, 0.9.2342.19200300.100.1.1=jessica.minnich,h@va.gov, cn=Jessica R. Minnich 137085
Date: 2018.03.21 15:04:49 -04'00'

JESSICA R. MINNICH
Chairperson