IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LORA FREIER-HECKLER, | ) | CASE NO.: 1:20 CV 367 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| DENNIS MCDONOUGH, SECRETARY | ) | |
| DEPT. OF VETERANS AFFAIRS, *et al.*, | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| Defendants. | ) | |

This matter is before the Court on Defendants' Motion for Summary Judgment.  (ECF #40).  Plaintiff has filed a response in opposition, and Defendants filed a reply in support of the motion.  (ECF #44, 45).  The Court heard arguments on the motion on February 1, 2022, and both parties filed supplemental briefs following oral argument.  (ECF #47, 48).  After careful consideration of the issues and a full review of the filings and all relevant authority, Defendants' Motion for Summary Judgment is, hereby, GRANTED.

## FACTS AND PROCEDURAL HISTORY[1]

Dr. Freier-Heckler originally filed her Complaint on February 2, 2020, and subsequently amended her Complaint twice.  (ECF #1, 5, 9).  Her Second Amended Complaint ("Complaint") alleges that, during her employment with Department of Veteran Affairs ("the VA"), Mr. Rutledge, her supervisor at the VA, discriminated against her based on her gender and created a hostile work environment.  The Complaint further alleges that the administration failed to take any action to address the alleged discrimination.  Dr. Freier-Heckler also asserts that the VA retaliated against her when she complained about this alleged discrimination.

Dr. Freier-Heckler had been employed by the VA's Cleveland Medical Center ("VMAC") since August of 1990.  (ECF #44-1).  Over the course of her tenure at the VMAC, Dr. Freier-Heckler was promoted multiple times and eventually achieved the position of Assistant Chief of Logistics Services.  At the time, Philip Rutledge was the Chief of Logistics Services.  He did the interviewing for the Assistant Chief position and was on the panel who chose Dr. Freier-Heckler to be appointed.  Dr. Freier-Heckler testified that "[h]e was the final decision who picked me." The Second Amended Complaint alleges that once she began working in this capacity, Mr. Rutledge discriminated against her based on her gender, and created a demeaning and hostile work environment for her.  Dr. Freier-Heckler describes a multitude of incidents which she found to be demeaning or disrespectful, and which she claims undermined her authority and ability to lead her subordinates, and to effectively perform the duties associated with her position.

---

[1]
In accordance with the applicable standards on a motion for summary judgment, genuine questions of material fact have been resolved in favor of the non-moving party, in this case, the Plaintiff.

Dr. Freier-Heckler addresses different conduct in different filings and often conflates the conduct she believes was discriminatory and which allegedly added to the creation of a hostile work environment, with that which she contends was retaliatory. She admits that many of these examples are insufficient, standing alone, to constitute violations of Title VII, but does not consistently identify which conduct she believes is sufficient to establish her claims of discrimination. In an attempt to support her claims of discrimination and hostile work environment she also includes multiple statements that lack any evidentiary support, or that rely on inadmissible hearsay. Those statements cannot be properly considered as support for her opposition to summary judgment.

The examples of allegedly discriminatory or hostile and offensive conduct that are consistently cited include an allegation that Mr. Rutledge refused to give her access to his personal computer calendar or access to sign off on employee leave and purchases, though she admits that there was no requirement that computer access be shared. (ECF #40-2, PageID 421-22, 434). Mr. Rutledge has testified that he removed everyone's access to his computer, but Dr. Freier-Heckler has identified two men who she claims have retained access. Both of these men were admittedly administrative workers tasked with adding appointments to his calendar. (ECF #40-2, PageID 432-34). She does not indicate whether other similarly situated male employees were also refused access, or whether any other female employees had access to Mr. Rutledge's calendar or had authority to sign off on leave and purchases.

Dr. Freier-Heckler also complained that Mr. Rutledge moved her office away from the employees she was supposed to supervise. This move entailed switching to an office across the hall which was in secured area that contained both her new office and the Mr. Rutledge's office.

-3-

(ECF #40-2, PageID 424-25).  She also consistently cites to the alleged existence of a "phony organizational chart" that appears to remove her position from the chain of command.  She has cited no evidence that would show this chart was ever implemented, or that it had a practical effect on her position or ability to do her assigned job.

Dr. Freier-Heckler has repeatedly referenced an incident in which Mr. Rutledge allegedly told her at one weekly meeting to stop talking, and dismissed her from the meeting in front of her subordinates and other employees.  (ECF #40-2, PageID 428).    She admits that this happened only once.  She recounts other incidents that she found demeaning or disrespectful.  For example, Mr. Rutledge asked her to babysit his ten year old son, and to pet sit, each on one occasion.  (ECF #40-2, PageID 426-27).  Although he claims he asked because he considered her to be friend, she says that they are not friends and believes he would never have asked if she were a man.  She further complains that Mr. Rutledge intentionally mispronounced her name and refused to call her "Doctor" after she received her PhD, even though he used the title with at least two male supervisors (ECF #40-2, PageID 442, ECF #44-1, PageID 854).  Although she did not mention it in her deposition, in the affidavit she submitted as part of her opposition to Summary Judgment Dr. Freier-Heckler also disclosed another incident she found to be humiliating.  During this incident Mr. Rutledge apparently shot a rubber band at her behind in front of co-workers.  (ECF #44-1, PageID 854).  In general, Dr. Freier-Heckler felt that Mr. Rutledge tried to control her work, for example asking her to attend all meetings with him.  (ECF #40-2, PageID 432, 442).  She thought he talked to women in a derogatory, harassing manner, but the only example she gave during deposition was asking a female employee not to wear heels during an inspection.  (ECF #40-2, PageID 419).  She also complained generally that she felt he "hung over my head"

-4-

and that she was worried that Mr. Rutledge would give her negative reviews or withhold incentive rewards if she didn't do what he asked her to do, but testified that her reviews remained outstanding while she worked under him, and that she had received incentive rewards as well. (ECF #40-2, PageID 423).

Dr. Freier-Heckler states that Mr. Rutledge told her she should not talk to other people she thought were in her chain of command, specifically the director, deputy director, and associate director. (ECF #40-2, PageID 430). She admits that this did not stop her from doing so, and indicates that she complained to the Director and Deputy Director of the VA about the alleged harassment on multiple occasions. (ECF #40-2, PageID 431; ECF #44-1, PageID 859). She also communicated with and met with the VA's Chief of Human Resources multiple times. She estimates that she met with these people approximately 187 times to discuss her complaints about Mr. Rutledge, and that she filed at least 65 complaints with the Human Resources department, and 87 complaints with the VA Director and Deputy Director. In 2017 she filed her first of several EEO charges.[2]

In early 2018, Dr. Freier-Heckler performed an audit during which she discovered over $7 million in allegedly improper and unlawful purchases made by someone who had been given purchasing authority by Mr. Rutledge. Approximately three weeks after she testified to an AIB[3]

---

[2]
 In her Second Amended Complaint, her Opposition to summary judgment, and her affidavit, Dr. Freier-Heckler argues that the VA Director confirmed that Rutledge created a hostile work environment. She provides no admissible evidence to support this, however. She does not cite to any statements by the Director, or any testimony from her deposition.

[3]
An AIB is composed of VA employees from outside the VAMC who interview witnesses, investigate allegations, and issue findings.

with regard to the audit findings, the VA convened a separate AIB to investigate allegations that

Dr. Freier-Heckler "created a hostile work environment by engaging in bullying, threatening, and

other unprofessional behaviors." (AIB Memo, p. 1). This AIB concluded that Dr. Freier-Hickler

was not suited to a management position because, among other things, she engaged in

unprofessional communications and did not display appropriate emotional intelligence. She was

found to have yelled, swore, exacerbated conflicts, and aired grievances about other managers in

front of her subordinates. The AIB recommended that Dr. Freier-Heckler be relieved of

managerial duties finding:

> Dr. Freier-Heckler uses a very legalistic and brash approach to managing staff, and
> is apt to publicly blame, become visibly agitated and communicate
> inappropriately. Dr. Freier-Heckler's conduct has demonstrated a significant lack
> of emotional intelligence, including a lack of self and relationship management.
> Furthermore, Dr. Freier-Heckler seems to have a self-important perspective
> focusing on her skills and abilities and demanding those of others. Finally, to the
> Board's knowledge, she has failed to acknowledge or take responsibility for her
> inappropriate actions. For these reasons, the Board would strongly caution
> Medical Center management from allowing Dr. Freier-Heckler to continue
> performing supervisory duties.

(AIB Mem. p. 22). Following this recommendation, the VA demoted Dr. Freier-Heckler to a

budget analysis position, which is a non-managerial position. Her demotion became official on

September 15, 2019.[4] Six months later she applied for and was awarded a promotion to the

position of system design manager, a non-supervisory position, on the same salary level as the

Assistant Logistics Chief position. Her six month demotion resulted in less than $1000.00 in lost

---

[4]

After the AIB convened, but before she was officially demoted, Dr. Freier-Heckler was
involved in performing another audit that uncovered 168 anomalies in the Transportation
Division. This led to a three level demotion for the head of Transportation, who operated
under Mr. Rutledge.

wages.

## **STANDARD OF REVIEW**

Summary judgment is appropriate when the court is satisfied "that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." FED. R. CIV. P. 56(c).  The burden of showing the absence of any such "genuine issue"

rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of
> informing the district court of the basis for its motion, and identifying those portions
> of 'the pleadings, depositions, answers to interrogatories, and admissions on file,
> together with affidavits, if any,' which it believes demonstrates the absence of a
> genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)).   A fact is

"material" only if its resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Determination of whether a factual issue is "genuine"

requires consideration of the applicable evidentiary standards.  Although evidence may be

presented in support of a summary judgment motion, the moving party need not support its

motion with affidavits or similar materials that negate the non-mover's claim(s) if they can

otherwise show an absence of evidence supporting the non-mover's case.  *Morris v. Oldham*

*County Fiscal Court*, 201 F.3d 784, 788 (6th Cir. 2000).  The court will view the summary

judgment motion in the light most favorable to the party opposing the motion.  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial

does not establish an essential element of their case.  *Tolton v. American Biodyne, Inc.,* 48 F.3d

937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-mover. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

*Id.* If a defendant "successfully demonstrates, after a reasonable period of discovery, that the plaintiff cannot produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case. . . ." the court should grant summary judgment.

-8-

*Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004).

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## ANALYSIS

### I. Gender Discrimination

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "It is well established that the burden is on an employment discrimination plaintiff to establish a *prima facie* case of discrimination." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citations omitted). A plaintiff may establish a claim of disparate treatment in one of two ways--via indirect or direct evidence. First, a plaintiff may establish her case "by presenting credible, direct evidence of discriminatory intent." *Mitchell*, 964 F.2d at 582 n.4. There is no such evidence in this case. In the absence of direct evidence of discriminatory intent, a plaintiff may establish a *prima facie* case of discrimination by showing that (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and, (4) a comparable non-protected person was treated better. *See, e.g., Vickers v. Fairfield Med. Ctr.,* 453 F.3d 757, 762 (6th Cir. 2006); *Knox v. Neaton Auto Prod. Mfg., Inc.,* 375 F.3d 451, 456-7 (6th Cir. 2004).

In applying this test, although the burden of persuasion remains with the plaintiff, the

burden of production shifts between the parties.  The Sixth Circuit has described this approach as follows: "(1) the plaintiff must establish a *prima facie* case of [] discrimination; (2) the employer must articulate some legitimate, nondiscriminatory reason for its actions; and (3) the plaintiff must prove that the stated reason was in fact pretextual."  *Harrison v. Metropolitan Gov't of Nashville and Davidson County*, 80 F.3d 1107, 1115 (6th Cir. 1996).

In order to establish pretext, the plaintiff "may succeed . . . either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Burdine*, 450 U.S. at 256.  However, in order to withstand summary judgment, a plaintiff must come forward with evidence demonstrating that the defendant's articulated nondiscriminatory justification is not true. *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1166 (6th Cir. 1996), *amended on denial of reh'g*, 97 F.3d 833 (6th Cir. 1996); *Manzer v. Diamond Shamrock CheDr, Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994).  To make a submissible case on the credibility of his employer's explanation, the plaintiff is required to show by a preponderance of the evidence (1) that defendant's proffered reasons for the adverse employment action had no basis in fact, (2) the proffered reasons did not actually motivate the action, or (3) the reasons were insufficient to motivate the adverse action.  *Manzer*, 29 F.3d at 1082.

Dr. Freier-Heckler is a woman.  She is,  therefore, a member of a protected class based on her gender.  There also should be no dispute that she was qualified for the Assistant Chief position.  The Defendant argues that her eventual demotion demonstrates that she was not qualified, however, her failure over time to maintain the level of professional demeanor that the VA purports to expect from its supervisors, is not tantamount to being unqualified for the

-10-

position. The undisputed evidence indicates that Dr. Freier-Heckler was chosen for the position over multiple other candidates, by her direct supervisor, following a full application and interview process. She came to the position with a long work history within the organization, with a wealth of institutional experience, and a history of outstanding performance. She successfully performed the job of Assistant Chief for several years receiving outstanding reviews and earning incentive payments. Though in the later years of her tenure in this position she failed to exercise the "emotional intelligence" and self control that the VA expects for managerial positions, there should be no dispute that she was qualified for the job.

There is no dispute that Dr. Freier-Heckler's demotion was an adverse action, however, she does not attempt to argue that she was demoted because of her gender. She attributes that action to retaliation for her multiple internal complaints of gender discrimination and her filing of EEOC claims, and it will be addressed in detail below in connection with her retaliation claim. She does argue that other conduct by Mr. Rutledge was discriminatory based on her gender, and should be considered adverse action, even though it did not affect her title or have a direct economic impact. Defendants disagree that such conduct can be considered "adverse employment actions" under a Title VII analysis.

1. Gender Discrimination

An adverse employment action has been defined by the United States Supreme Court as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). Defendants, citing *Burlington Indus.* and *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 795 (6th Cir. 2004), argue that an actionable adverse action is, therefore,

-11-

one that inflicts direct economic harm, generally requiring a change in hours or salary.  Title

VII's private sector prohibition does not limit adverse actions to only those that inflict economic

harm, however.  Section 703(a)(1) prohibits discrimination on the basis of sex with respect to

"compensation, terms, conditions, or privileges of employment." 42 U.S.C. 2000e-2(a)(1).  The

federal sector provisions are arguably even more broad, declaring that "[a]ll personnel actions

shall be made free from any discrimination based on [sex]." 42 U.S.C. 2000e-16(a); *see also,*

*Gomez-Perez v. Potter*, 553 U.S. 474, 487(2008).    Though not limited to economically

impactful actions, in order to be actionable, an adverse action must be "more disruptive than a

mere inconvenience or a mere 'alteration of job responsibilities." *Threat v. City of Cleveland*, 6

F.4th 672, 679 (6th Cir. 2021)(citing *Kocsis v. Multi-Care Mgmt., Inc.*,  97 F.3d 876, 886 (6th Cir.

1996).  As the working environment could be considered a condition or privilege of employment,

acts that create disruption in a plaintiff's working conditions that goes beyond a mere

inconvenience, could potentially qualify as an adverse employment action.

  Dr. Freier-Heckler admits that many of the actions and incidents outlined in the fact

section above, and otherwise outlined in her Second Amended Complaint and briefs in

opposition to summary judgment are not serious enough, taken individually, to violate Title

VII.  (ECF #48, PageID 938, 945; ECF #44, PageID 845).[5]  Of those that she has argued do

violate Title VII, Dr. Freier-Heckler has not pointed to any evidence that would support a

---

[5]

In  her Post-Argument Memorandum in Opposition to Defendant's Motion for Summary
Judgment, Dr. Freier-Heckler specifically admits that refusing to address her as "Doctor,"
intentionally mispronouncing her last name, telling her to stop talking at a staff meeting,
and refusing an order to apologize to her, do not, standing alone, violate Title VII.  (ECF
#48, PageID 937-38).

finding that the conduct was motivated by her gender.  Further, she has made no attempt to

show that any similarly situated male employee was treated differently in these respects.

Therefore she has failed to establish a *prima facie* case of gender discrimination.  Further, in

those instances where the Defendants have provided a non-discriminatory reason for the

action(s), Dr. Freier-Heckler has not provided any evidence that those reasons were pretextual.

The actions that Dr. Freier-Heckler specifically claims went beyond mere offense or

inconvenience and which she alleges had a disruptive effect on her working conditions are the

following:  (1) barring access to her subordinates; (2) removing her access to Mr. Rutledge's

calendar; and (3) the generation of a "phony organizational chart" which removed her from the

chain of command.[6]  She claims that she was barred access to her subordinates when her office

was moved across the hall into the management suite, which is set off by a door that she says

remains locked.  She does not allege that her subordinates could not visit her in that office at

her invitation, or that she could not leave the office at will to interact with them in their

working space.  Moving the Assistant Chair's office in the management suites next to the

Chair's office, even if  against her wishes, does not materially affect her working conditions or

---

[6]

 The Court sought additional briefing, post-argument, on the question of which acts the
Plaintiff claims are "adverse employment actions" under Title VII.  These three examples
are the only specific conduct explicitly identified by Plaintiff in her post-argument brief.
She also refers to the alleged organization of worker complaints in order to force an AIB
investigation into her conduct.  However, she clearly states that the motivation behind
"organizing crooked transportation workers to concoct an AIB" was retaliation for her
discovering anomalies unfavorable to Mr. Rutledge and his friend(s) during a
departmental audit.  (ECF # 48, PageID 938)  Uncovering internal problems during an
audit is not a protected activity under the gender discrimination provisions of Title VII
and retaliation based on such activity is not a claim contained in the Second Amended
Complaint, or would not be covered by the EEOC's right to sue determination.

amount to anything more than a mere inconvenience. *See, Fercello v. Cty. of Ramsey*, 612 F.3d 1069, 1078 (8th Cir. 2010)(an office move is "the kind of annoyance or petty slight that [courts] have held does not constitute actionable harm."). Further, the male Chair's office was also in the management suite. She can point to no similarly situated men who successfully sought to avoid a similar office re-location. Dr. Freier-Heckler, therefore, cannot make out a *prima facie* case of gender discrimination on this issue.

Dr. Freier-Heckler also claims that at some point during her tenure, her access to Mr. Rutledge's calendar was withdrawn. She admits, however, that he had no obligation to provide her with access to his calendar. Dr. Freier-Heckler does not claim to have needed access in order to add things to Mr. Rutledge's calendar, rather, she used the calendar to see what meetings Mr. Rutledge was attending so that she could also attend. When he cut off her access it was because "[i]f I wanted you at a meeting, I would invite you to a meeting and send you a meeting invite." (ECF #40-2, PageID 432). She has not demonstrated that the removal of her access to Mr. Rutledge's personal calendar constitutes an adverse employment action for purposes of Title VII.

Further Mr. Rutledge claims that he removed access from all supervisors, male and female. (ECF #40-2, PageID 432). Dr. Freier-Heckler has not identified any similarly situated male supervisors overseen by Mr. Rutledge who retained access to his calendar after Dr. Freier-Heckler's access was withdrawn. She identifies only two other employees, both male, who maintained access to the calendar, however, neither was similarly situated. In order to prove the fourth prong of a *prima facie* case, Dr. Freier-Heckler must show that these male employees, were similarly situated in all relevant aspects. *See Ercegovich v. Goodyear Tire &*

-14-

*Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998). Similarly situated employees are those who "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Differences in job title and responsibilities, among other factors, can establish that two employees are not similarly situated for purposes of determining disparate treatment. *See Campbell v. Hamilton Cty.*, 23 F.App'x 318, 325 (6th Cir. 2001). In this case, one of men identified was a program management analyst, and the other was an administrative clerk. Both of these people were "administrative people" tasked with putting items onto Mr. Rutledge's calendar. (ECF #40-2, PageID 433-34). These men are not similarly situated to Dr. Freier-Heckler in this context, and she has not established a *prima facie* case of gender discrimination based on this conduct.

The alleged generation of a "phony organizational chart" also fails to establish a Title VII violation. There is no allegation that the "phony organization chart" was ever implemented, or that it had any effect on Dr. Freier-Heckler's actual job responsibilities, or ability to perform her work, let alone that it was disruptive to her work conditions. Further, as there was only one Assistant Chief of Logistics, and it was a new position defined and described by Mr. Rutledge, a man who, according to Dr. Freier-Heckler "was used to running the department without an Assistant Chief," the fact that he considered an organizational chart that kept the Assistant to the side at the beginning of her tenure while she learned the job, does not logically lead to an inference that the chart was discriminatory on the basis of gender. This is especially true since Mr. Rutledge did interview male applicants for the position and yet, he offered Dr. Freier-

-15-

Heckler the position, finding her to be more qualified.  More importantly, Dr. Freier-Heckler has not identified any similarly situated men who were treated more favorably.  She cannot, therefore, establish a *prima facie* case of discrimination based on this conduct.

    2.  Gender Based Hostile Work Environment

       When individual acts do not independently rise to the level of an actionable "adverse action," but combine together to create harassment and intimidation, a plaintiff may still be able to prove gender discrimination by way of a hostile work environment.  In order to prove the existence of a hostile work environment on the basis gender, Dr. Freier-Heckler is required to show that: (1) she is a member of a protected class; (2) she was subjected to harassment, either through words or actions, based on her gender; (3) the harassment had the effect of unreasonably interfering with her work performance and creating an objectively intimidating hostile or offensive work environment; and, (4) there exists some basis for liability on the part of the employer.  *Grace v. USCAR*, 521 F.3d 655, 678 (6th Cir. 2008).   The standards for employer liability differ depending on whether the alleged harassment is perpetrated by a co-worker, or by a supervisor.  *Newton v. Ohio Dept' of Rehab. & Correction – Toledo Corr. Inst.*, 496 Fed. Appx. 558, 563 (6th Cir. 2012). If the harassment comes from a supervisor, an employer is vicariously liable for the creation of a hostile work environment.  *Id. See also*, *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013).  A "supervisor," for these purposes, is "an individual who serves in a supervisory position and exercises significant control over plaintiff's hiring, firing or conditions of employment."  *Id*.  As Defendants acknowledge, Dr. Freier-Heckler is a member of a protected class, and because she alleges that she was harassed by her supervisor, the VA would be vicariously liable if the other elements of a hostile work

-16-

environment are proven.

The question then remains whether Dr. Freier-Heckler has shown that she was subjected to gender-based harassment that had the effect of unreasonably interfering with her work performance and creating an objectively intimidating hostile or offensive work environment. She has not met this burden. To be actionable, the harassment must be "'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)(quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." *Id.* To assess whether conduct rises to the level of an actionable hostile work environment, court must consider the totality of the circumstances, "including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance. . . .'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)(quoting *Harris,* 510 U.S. at 23).

There is no admissible evidence that would support a finding her gender in any way motivated the conduct Dr. Freier-Heckler claims created a hostile work environment. For example, she complains that Mr. Rutledge attempted to have a lesser credentialed friend hired to the position. The evidence is clear, however, including through Dr. Freier-Heckler's own testimony, that Mr. Rutledge made the final decision to hire her for the position. (ECF #45-1). Further, her own position was that this other candidate was allegedly encouraged, not because he was male, but because he was a social friend of Mr. Rutledge. Dr. Freir-Heckler also claims

-17-

that Mr. Rutledge took various actions to reduce her responsibilities, including denying her the authority or access to approve leave for her subordinates or to approve purchases. She states that the access for approvals would be something "an assistant chief or chief would have," but provides no evidence that the duties and responsibilities allegedly withheld from her were typically performed by managers at her level throughout the VA, or that they were ever part of the job description for the position of Assistant Chief. There is no evidence, whatsoever, tying her gender to the fact that she was not given such access.   There is no way to know from the information provided whether access was withheld because Mr. Rutledge did not trust her, as she indicated in her deposition; because it was never a part of her job; because he did not want to give up that control; because he did not want her to have access to notice the anomolies later uncovered during her audit; or, for some other reason altogether.  However, there is absolutely no evidence that would suggest it was because of her gender.  Further, even if withholding access were somehow influenced by her gender, it does not rise to the level of intimidation, offensiveness, or hostility.  There is no evidence that due to the lack of access she was not able to do her job, or that it interfered with her ability to gain positive reviews, monetary incentives, or access to other opportunities within the VA.  There is also no evidence

Dr. Freier-Heckler also complains that Mr. Rutledge intentionally mispronounced her name, but does not contest that it was because he grew up in Germany and decided for himself that he would use the German pronunciation.  She does not have any evidence that would show, or even infer that he did this because of her gender.   She claims that Mr. Rutledge has "issues with women" and treats them differently than men, however, the only example she could provide was an incident when Mr. Rutledge asked a female worker not to wear high heels

-18-

during an inspection. There are multiple non-discriminatory reasons why this request might make sense, and even if it was somehow intended as a slight against women, this single instance can hardly be counted on to show the existence of a pervasive and objectively hostile, offensive, or intimidating environment for women working under Mr. Rutledge.

Being hit in the rear end by a rubber band,[7] being asked to babysit and house/pet sit, having one superior refuse to call her Dr. despite using the title with male colleagues, and being told once, in a single meeting, not to talk anymore,[8] do not create a sufficiently severe and pervasive atmosphere of hostility, offense, or intimidation to rise to the level of a hostile work environment actionable under Title VII. The rubber band incident, though clearly inappropriate, occurred once during the several years she held the position at issue. There is no evidence that it occurred because of her gender, and there are no allegations that he shot rubber bands at any other employee, male or female. It was, however, clearly an unwanted touching in a sensitive area and could be considered to be sexually intrusive. At no point did Dr. Freier-Heckler demonstrate that she was intimidated or otherwise deterred from coming into work,

---

[7] This incident was not disclosed by Dr. Freier-Heckler in her either Complaint, or in her deposition. Despite being asked to describe all the ways in which Mr. Rutledge created a hostile work environment, this incident was never mentioned until she filed an affidavit in support of her Opposition to the Motion for Summary Judgment, after the close of discovery. Therefore, even if this incident had created a genuine issue of fact, the Court could disregard it as inappropriately raised. *See generally, Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986); *Smith v. Consolidated Rail Corp.*, 91 F.3d 144, *4 (6th Cir. 1996). The same holds true for her claims that her office was moved, that her name was mispronounced, and that Mr. Rutledge compared her position to an "internship."

[8] In her affidavit Dr. Freier-Heckler refers to being silenced in staff meetings, plural. In her deposition she clearly testified that she was told she couldn't talk on only on one occasion. (ECF #45-1). She also testified that she confronted Mr. Rutledge following the one instance when this occurred. (ECF #40-2, Page ID 429).

-19-

doing her job, or being willing and able to confront Mr. Rutledge and his superiors about this or any of other issues she raises in support of her claim.

Mr. Rutledge admits to asking her to babysit and pet sit, each on one occasion. He claims that he did so because they were friends, which she disputes. The requests were not work related. Even if it could be inferred that Dr. Freier-Heckler would not have been asked to do these favors if she had not been a woman, there is no actual evidence that this is the case. Though Dr. Freier-Heckler claims that she was afraid to say no to these requests, she does not suggest that any threats were made explicitly or implicitly to gain her agreement to perform these non-work related tasks; nor does she provide any reason to believe that she would have been retaliated against if she not agreed. It is not objectively reasonable to think that these relatively minor and isolated incidents, which were not overtly gender based, were sufficient to create a severe and pervasive hostile work environment based on gender. The other most significant examples of allegedly offensive or hostile actions are addressed more fully in the gender discrimination section above, and Dr. Freier-Heckler also fails to establish any gender based motivation for those acts.

Dr. Freier-Heckler does establish that she was subjected to actions, comments, and situations that she found subjectively offensive and demoralizing, and that she believed were meant to demean her and keep her from exercising what she believed to be an appropriate level of responsibility and authority for her position. She does not establish that these acts were undertaken because of her gender, or that they actually interfered with her ability to do the work

-20-

her employer expected of her within the role that she was hired to perform.[9]  She fails to

establish that the VA created an objectively intimidating, hostile, or offensive work

environment, that was severe and pervasive.   There is, for better or worse, no legal prohibition

against offensive or demeaning comments and actions that are not based on a protected

classification.  Nor is there Title VII protection against isolated or infrequent acts that are

merely annoying, inconvenient, or even in bad taste.  Title VII is not a general civility code,

intended to address "the ordinary tribulations of the workplace, such as the sporadic use of

abusive language, gender-related jokes, an occasional teasing" and other similar behaviors.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also, Oncale v. Sundowner

Offshore Services*, 523 U.S. 75, 79 (1998).

     3.  Demotion

     Dr. Freier-Heckler claims that she was demoted in retaliation for filing multiple gender

discrimination complaints, including EEOC complaints, against the VA and her supervisor(s).[10]

---

[9]

Dr. Freier-Heckler has also demonstrated that she was not intimidated by Mr. Rutledge's
conduct.  She filed more than 187 internal complaints, and at least three EEOC
complaints.  She also testified that she had sometimes confronted Mr. Rutledge about his
behavior if she found it improper, and that she ignored his alleged attempts to prevent her
from talking to other higher ups in her chain of command.  (ECF #40-2 PageID 425, 429-
31).

[10]

 In her Memorandum in Opposition to Defendant's Motion for Summary Judgment, Dr.
Freier-Heckler fails to identify a correlation between any alleged adverse action and any
protected activity.  In fact, she does not even cite a single protected activity in the
argument section of her brief. She merely restates a few random incidents that were
included in the list of conduct that she alleges created a hostile work environment.  She
claims in the accompanying affidavit that the removal of access to Mr. Rutledge's
calendar and being asked to leave a meeting were acts of retaliation, while in other
briefing she attributes these things to gender discrimination.  In either case, for the
reasons set forth above, removal from the calendar and single instance of being asked to

In order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and, (4) there was a causal connection between the protected activity and the adverse employment action or harassment.  *See Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018); *Ceckitti v. City of Columbus, Dep't of Pub. Safety, Div. of Police*, 14 F. App'x 512, 515-16 (6th Cir. 2001).  As with direct discrimination claims, analysis of a retaliation claim follows the *McDonnell Douglas* burden-shifting framework.  This framework, set forth in more detail above, dictates that a plaintiff bears the initial burden of establishing a *prima facie* showing of retaliation, and if accomplished, the defendant must then show a non-pretextual, non-retaliatory reason for the action.

Assuming, without deciding, that Dr. Freier-Heckler could prove a *prima facie* case of retaliatory demotion, Defendants have offered a legitimate non-discriminatory reason for her demotion: a perception, based on a full investigation by board members that were not a part of her department, that she had been unprofessional in her demeanor and was not well suited to the direct management of subordinates.  Dr. Freier-Heckler has not come forth with any evidence whatsoever that would prove the Defendant's articulated non-retaliatory justification for her demotion is not true.  In fact, Dr. Freier-Heckler's testimony at her deposition corroborates

---

leave a meeting do not constitute adverse employment actions, or rise to the level of severe or persistent harassment as required to establish a *prima facie* case of discrimination or retaliation.

some of the findings of the AIB which determined that she had acted unprofessionally in her managerial role. (ECF #40-2, PageID 439). In an attempt to show that the Defendants stated reason for her demotion was pretextual, Dr. Freier-Heckler argues that, even after her demotion, she continued to be chosen to be the primary investigator on various audits. (ECF #44, PageID 847; ECF #48, PageID 938-41). Defendants, however, never challenged her ability or fitness to perform audits or other administrative aspects of her job. In fact, they acknowledge that she was a valued employee who had outstanding reviews. Their stated reason for demoting her was that they found her to be unsuited, specifically, to the direct supervision of subordinates, which duties were inherent in the Assistant Chief position. None of her assignments since her demotion have been shown to include similar supervisory duties. Therefore, even if Dr. Freier-Heckler could demonstrate a prima facie case of retaliation based on her demotion, she has not provided any evidence that would show the stated reason for her demotion was pretextual. Her claim for retaliation, therefore, fails as a matter of law.

## CONCLUSION

For the reasons set forth above, the Defendant's Motion for Summary Judgment (ECF #40) is hereby GRANTED. This case is dismissed with prejudice. IT IS SO ORDERED.

Judge Donald C. Nugent
United States District Judge

Date: February 28, 2022